FILED

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE MIDDLE DISTRICT OF LOUISIANA

99 OCT 14 PM 2:01

J. LYNN BURKETT CLERK
UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA
UNITED STATES BANKRUPTCY CT.
MIDDLE DIST. OF LOUISIANA

| | |
|---|---|
| In re: | CIVIL ACTION NO. 94-2763-B2 |
| CAJUN ELECTRIC POWER COOPERATIVE, INC., | BANKRUPTCY CASE NO. 94-11474 |
| Debtor. | Chapter 11 |
| Federal Tax Id. No.: 72-0655799 | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND
ORDER CONFIRMING THE SECOND AMENDED AND RESTATED
CREDITORS' PLAN OF REORGANIZATION DATED SEPTEMBER 21, 1999
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

On this 14th day of October, 1999, this Court makes the following findings of

fact and conclusions of law[1] and enters the following orders confirming the Creditors'

Plan (as hereinafter defined):

BACKGROUND FINDINGS AND CONCLUSIONS OF LAW

A.   **The Competing Plan Process**

1.   Previous Plans.  In December of 1996, the Court commenced confirmation

hearings on three competing plans of reorganization in the chapter 11 case of Cajun Electric

---

[1] The findings and conclusions set forth herein and in this Court's Reasons For Decision constitute the Court's findings and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  To the extent any finding of fact shall later be determined to be a conclusion of law, it shall be so deemed, and vice versa.

5636

Power Cooperative, Inc. ("Cajun"):[2] (i) the Trustee's Plan of Reorganization (the "Trustee's

Original Plan") which incorporated an asset sale to Louisiana Generating LLC ("Generating"), a

joint venture consisting of NRG Energy, Inc. ("NRG"), Southern Energy-Cajun, Inc. (with its

affiliate Southern Energy, Inc., "Southern Energy") and Zeigler Coal Holding Company;[3] (ii) the

Joint Plan of Southwestern Electric Power Company ("SWEPCO") and the Members' Committee

which incorporated an asset sale to SWECO, a wholly owned subsidiary of SWEPCO (the

"SWEPCO Original Plan"); and (iii) the Joint Plan of Reorganization of the Official Committee

of Unsecured Creditors (the "Creditors' Committee") and Enron Capital & Trade Resources

Corp. ("Enron") (the "Enron Plan") which incorporated an asset sale to Enron. The Enron Plan

was subsequently withdrawn. The Trustee's Original Plan and the SWEPCO Original Plan shall

be referred to hereinafter as the "Previous Plans."

       2.      Approval of Master Disclosure Statement. In connection with the Previous Plans,

the Trustee, on November 8, 1996, filed the Second Amended Master Disclosure Statement (the

"Master Disclosure Statement"). By Order dated November 12, 1996, this Court approved the

Master Disclosure Statement holding that it contained adequate information relating to the

common elements of the Previous Plans and with respect to Cajun and its operations.

       3.      Initial Ruling on Confirmation. After the conclusion of the confirmation hearing

on the Previous Plans, on February 11, 1999, this Court issued its Reasons for Decision (along

---

[2]  All capitalized terms used herein without definition all have the meanings ascribed to such terms in the
Creditors' Plan, the Asset Purchase Agreement, the Master Disclosure Statement and the Trustee's
Supplemental Disclosure Statement.

with the accompanying order, the "Previous Confirmation Decision") holding that the Previous

Plans were not confirmable. *See In re Cajun Electric Power Cooperative, Inc.*, 230 B.R. 715

(Bankr. M.D. La. 1999). This Court also issued its Reasons for Decision along with an

accompanying judgment order (the "1052 Ruling") in that certain Adv. Pro. No. 96-1052. *See In*

*re Cajun Electric Power Cooperative, Inc. (Cajun Electric Members Committee v. Mabey)* (Adv.

Pro. No. 96-1052), 230 B.R. 693 (Bankr. M.D. La. 1999). In addition, this Court also issued its

Reasons for Decision in certain other adversary proceedings related to the Previous Plans. *See In*

*re Cajun Electric Power Cooperative, Inc. (Entergy Gulf States, Inc. v. American Commercial*

*Terminals, Inc.)* (Adv. Pro. Nos. 97-1002 and 97-1068), 230 B.R. 683 (Bankr. M.D. La. 1999).

    4.    <u>Invitation to Submit Revised Plans</u>. In the Previous Confirmation Decision, this

Court invited Ralph R. Mabey, as chapter 11 trustee (the "Trustee"), and SWEPCO, based on the

guidance provided by the Previous Confirmation Decision, to amend their respective plans of

reorganization and submit such revised plans for the Court's further consideration.

    5.    <u>Filing of Current Plans</u>. On March 23, 1999, this Court issued its Ninth Order

Amending Supplemental Scheduling Order for Disclosure Statement and Confirmation Hearings

on Competing Plans and Related Matters (the "Ninth Scheduling Order"). The Ninth Scheduling

Order provided for the service of amended plans and disclosure statements on April 16, 1999

followed by filing on April 19, 1999. By this deadline, the proponents of the Previous Plans

---

[Footnote continued from previous page]

[3]   As a result of the withdrawal of Zeigler Coal Holding Company and Southern Energy as members of
Generating, NRG presently owns 100% of the membership interests in Generating.

each filed amended plans and disclosure statements designed to address the deficiencies found by the Court in the Previous Plans.

6.    <u>Filing of Amended Supplemental Disclosure Statement</u>.  In connection with the filing of amended plans on April 19, 1999, the Trustee and SWEPCO each filed amended supplemental disclosure statements, which provided information relating to the specifics of each amended plan.  The court did not require the Trustee to file an amended Master Disclosure Statement, but allowed reliance on and the use of the Master Disclosure Statement, as previously approved.  A hearing was held on May 4, 1999 to determine the adequacy of the amended supplemental disclosure statements with respect to the competing plans filed on April 19, 1999.  As a result of this hearing and to resolve the objections raised in connection with the competing plans, this Court allowed further revisions to each of the amended plans and related supplemental disclosure statements.  On May 14, 1999, the Trustee filed the Trustee's Fourth Amended and Restated Plan of Reorganization Dated May 14, 1999, which incorporated the proposed sale of assets to Generating (the "Trustee's Plan") and the Fourth Amended Supplemental Disclosure Statement, dated May 14, 1999 related to the Trustee's Plan (the "Trustee Supplemental Disclosure Statement").  On May 14, 1999, the Committee of Certain Members ("CCM"), Washington-St. Tammany Electric Cooperative, Inc. ("WST") and SWEPCO filed their Joint Plan of Reorganization for Cajun Electric Power Cooperative, Inc. (the "SWEPCO Plan") and a supplemental disclosure statement, dated May 14, 1999, related to the SWEPCO Plan (the "SWEPCO Supplemental Disclosure Statement").  Both the SWEPCO Plan and the Trustee's Plan were further amended prior to the Court's ruling on confirmation respecting these plans.

7.    <u>Approval of Disclosure Statements and Solicitation</u>.  By Order dated May 20,

1999 (the "Disclosure Order"), this Court approved the Trustee Supplemental Disclosure

Statement and the SWEPCO Supplemental Disclosure Statement and held that these documents,

coupled with the previously approved Master Disclosure Statement, contained adequate

information, as required by 11 U.S.C. § 1125, regarding the Trustee's Plan and the SWEPCO

Plan, respectively.  The Trustee's Plan and the SWEPCO Plan are sometimes collectively

referred to hereinafter as the "Competing Plans."  The Disclosure Order set forth notice, voting

and balloting procedures related to confirmation of the Competing Plans and fixed June 22, 1999

at 1:30 p.m. CDT as the commencement of confirmation hearings on the Competing Plans.  Due

and proper notice of the confirmation hearing was given by mail to all creditors, members, and

other parties in interest entitled to such notice pursuant to the Federal Rules of Bankruptcy

Procedure.  The solicitation of acceptances or rejections from holders of claims and interests was

made in good faith and complied with the Disclosure Order and applicable law.

8.    <u>Objections to Member Rejection Damages</u>.  On May 21, 1999, the Trustee

amended the Debtor's schedules to include all claims, if any, arising from the rejection of the

Members' all-requirements contracts (the "ARCs") as disputed claims and filed (1) an objection

to such rejection damage claims, and (2) a Motion for Determination Under Rule 3013 of the

Proper Classification of Members' Rejection Damage Claims (the "Trustee's Damage Claims

Objection and Motion").  A hearing on the Trustee's Damage Claims Objection and Motion was

scheduled to occur on June 22, 1999, simultaneously with the confirmation hearing on the

Competing Plans.  Due and proper notice of this hearing was given.  Southwest Louisiana

Electric Membership Corporation ("SLEMCO"), Pointe Coupee Electric Membership

Corporation ("Pointe Coupee") and Concordia Electric Cooperative, Inc. ("Concordia") executed
stipulations with the Trustee wherein they agreed to waive their damage claims, if any, that
would be incurred upon the rejection of their ARCs. The Creditors Committee, the Rural
Utilities Services (the "RUS"), Generating and the Fuel Chain[4] joined in the Trustee's Damage
Claims Objection and Motion.

     9.     <u>Objections to Competing Plans</u>. Objections to confirmation of the Trustee's Plan
were filed by the Louisiana Public Service Commission (the "LPSC"), SWEPCO, the CCM,
Claiborne Electric Cooperative, Inc. ("Claiborne"), WST and Entergy Gulf States, Inc.
("Entergy"). On June 11, 1999, SWEPCO also filed a Supplemental Objection to Confirmation
of the Trustee's Plan. Objections to confirmation of the SWEPCO Plan were filed by the LPSC,
the RUS, Pointe Coupee, SLEMCO and Concordia, the Burlington Northern and Santa Fe
Railway ("BN"), Western Fuels Association ("WFA"), Triton Coal Company ("Triton"),
American Commercial Marine Service ("ACMS"), the Trustee, Generating, Entergy and the
Creditors' Committee. Supplemental Objections were filed to the SWEPCO Plan by the Fuel
Chain on June 16, 1999, by SLEMCO, Pointe Coupee and Concordia on June 18, 1999 and by
the Creditors' Committee on June 21, 1999.

     10.     <u>Co-Plan Proponents and Creditors' Plan</u>. On June 11, 1999, the Creditors'
Committee, Generating, SLEMCO, Pointe Coupee and Concordia (collectively, the
"Proponents") became co-plan proponents of the Trustee's Plan. On June 22, 1999, the Trustee

---

[4]   The "Fuel Chain" is a collective reference to American Commercial Terminals (a division of American
Commercial Marine Service Company), Burlington Northern and Santa Fe Railway Company, Western Fuels
Association, Inc. and Triton Coal Company.

moved in open Court to withdraw as a co-plan proponent conditioned on the Court's

determination, pursuant to Fed.R.Bankr.P. 3019, that the addition of the Proponents to the

Trustee's Plan did not require the resolicitation of accepting creditors and equity holders and that

the Trustee's Plan, as amended by the addition of the Proponents, would be deemed accepted by

all creditors and equity security holders who had previously accepted the Trustee's Plan. The

Trustee's withdrawal was approved by this Court by written order dated June 25, 1999. The

Court, in its June 25, 1999 order, also determined that neither the withdrawal of the Trustee as a

plan proponent nor the addition of the Proponents as plan proponents were adverse changes to

the Trustee's Plan, and that the votes to accept the Trustee's Plan would be deemed to be

acceptances of the newly-sponsored Trustee's Plan. Upon the withdrawal of the Trustee as a co-

plan proponent of the Trustee's Plan, the Trustee's Plan was thereafter renamed as the "Creditors'

Plan." Notwithstanding his withdrawal as a co-plan proponent, the Trustee continued to support

confirmation of the Creditors' Plan (formerly the Trustee's Plan).

11.     Balloting Report. On June 21, 1999, the Trustee filed the Report of Balloting

Agent tabulating the ballots cast in favor of and in opposition to the Competing Plans (the

"Ballot Report") prepared by Postlethwaite & Netterville ("P&N"), the Voting Agent. The

Trustee's (now Creditors') Plan was accepted by all creditor classes, but was rejected by the

"Allowed Member Interests Class" by an 8 to 3 vote. The SWEPCO Plan was accepted by

secured creditor classes and by an 8 to 3 majority of the member interests class, but was rejected

by the unsecured creditors' class.

12.     June 24, 1999 Amendments to Creditors' Plan. On June 24, 1999, the Proponents

of the Creditors' Plan filed (i) an Amendment to (I) Creditors' Plan of Reorganization Revised as

of June 24, 1999 Which Incorporates the Proposed Sale of Assets to Louisiana Generating LLC

and (II) The Asset Purchase Agreement (the "First Amendment") and (ii) a Second Amendment

to (I) Creditors Plan of Reorganization Revised as of June 24, 1999 Which Incorporates the

Proposed Sale of Assets to Louisiana Generating LLC and (II) The Asset Purchase Agreement

(the "Second Amendment"). The First Amendment contained several changes to the Creditors'

Plan to address objections raised by certain parties. The Second Amendment increased the

purchase price under Generating's Asset Purchase Agreement incorporated in the Creditors' Plan

from $960 million to $995 million. The Proponents of the Creditors' Plan filed motions pursuant

to Bankruptcy Rule 3019 regarding the First Amendment and Second Amendment on June 24,

1999. On July 30, 1999, the Proponents filed the Creditors' Amended and Restated Plan of

Reorganization which amended and restated the Creditors' Plan to incorporate the modifications

made by the First Amendment and the Second Amendment and to reflect the Trustee's

withdrawal as a co-plan proponent.

13.    <u>Withdrawal of Objections</u>. As a result of the First Amendment, on June 29, 1999,

Entergy withdrew its objection to the Creditors' Plan. On June 17, 1999, the RUS withdrew its

objection to the SWEPCO Plan, but maintained its preference pursuant to Bankruptcy Code

§ 1129(c) for the Trustee's (now Creditors') Plan.[5] The LPSC stated in its Brief on

Confirmation Issues dated July 16, 1999, that it had "no objection to and no current preference"

as to confirmation of either the Creditors' Plan or the SWEPCO Plan.

---

[5]    All references to Section or § shall refer to sections of the Bankruptcy Code.

14.    <u>Confirmation Hearing</u>. From June 22, 1999 through June 25, 1999, this Court

held evidentiary hearings to consider (i) confirmation of the Competing Plans, (ii) other matters

contemplated by the Competing Plans and the Ninth Scheduling Order and (iii) the Trustee's

Damage Claims Objection and Motion. The evidence adduced at the confirmation hearings held

by this Court on the Previous Plans was incorporated into and considered by this Court in

connection with the confirmation hearings held on June 22 - 25, 1999 with respect to the

Creditors' Plan and the SWEPCO Plan. All hearings on confirmation of the Previous Plans and

on confirmation of the Competing Plans shall hereinafter collectively be referred to as the

"Confirmation Hearing."

15.    <u>Final Bids Under the Competing Plans</u>. On July 28, 1999, SWEPCO filed a plan

amendment which increased its purchase price from $990,500,000 to $1,025,500,000. On

July 30, 1999 Generating filed an objection to such increase and conditionally increased in its

own purchase price from $995,000,000 to $1,026,000,000. On August 9, 1999, this Court issued

an order (i) approving these purchase price increases and (ii) establishing a bar date for final

increases to purchase prices under the Competing Plans. The bar date was set at 12:00 noon

CDT on August 13, 1999. On this bar date, Generating filed a final bid increasing its purchase

price to $1,045,500,000.50. SWEPCO filed no further price increase leaving its final bid at

$1,025,500.000.

16.    <u>Confirmation Settlement</u>. On August 18, 1999, the Honorable Frank J. Polozola,

Chief United States District Judge for the Middle District of Louisiana (the "District Court"),

entered an order *sua sponte* directing all parties in interest to appear and conduct settlement

negotiations before him on August 25, 1999. As a result of the court ordered settlement

negotiations, all interested parties entered into a Settlement Agreement Relative to Confirmation

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING THE SECOND AMENDED
AND RESTATED CREDITORS' PLAN OF REORGANIZATION DATED AS OF SEPTEMBER 21, 1999
UNDER CHAPTER 11 OF THE BANKRUPTCY - PAGE 9

of Creditors' Plan in Chapter 11 Case of Cajun Electric Power Cooperative, Inc. (the

"Confirmation Settlement") on August 26, 1999.  Among other things, the Confirmation

Settlement provides that the SWEPCO Plan is withdrawn, the purchase price under the Creditors'

Plan is set at $1,026,000,000 and the SWEPCO PPA option offered under the Creditors' Plan is

designated as the 1998 version of the SWEPCO PPA with a 1/2 mill rate increase.  Paragraph 4

of the Confirmation Settlement provides as follows:  "The Parties shall withdraw their

opposition, if any, to confirmation of the Creditors' Plan and stipulate and consent to the entry of

an order confirming the Creditors' Plan as modified by this Settlement Agreement.  All pending

motions and/or objections challenging confirmation of the Creditors' Plan shall be withdrawn

and/or dismissed."  In addition, the LPSC, the RUS and the Trustee entered into a settlement (the

"LPSC/RUS Settlement") which is incorporated into the Confirmation Settlement and resolves

certain litigation pending in federal and state courts and potential rate cases before the LPSC.

The District Court approved the Confirmation Settlement by order dated August 26, 1999 (the

"Confirmation Settlement Order").  The Confirmation Settlement (including Exhibit A thereto,

the LPSC/RUS Settlement) was approved by the LPSC on September 15, 1999.

     17.    <u>Filing of Second Amended Creditors' Plan Including Confirmation Settlement</u>.

On or about September 21, 1999, the Proponents of the Creditors' Plan filed a Second Amended

and Restated Creditors' Plan of Reorganization which incorporates the terms of the Confirmation

Settlement.  The Proponents also filed a motion pursuant to Bankruptcy Rule 3019 to deem the

votes in favor of the Trustee's Plan to be votes in favor of the Second Amended and Restated

Creditors' Plan of Reorganization.  Hereinafter, all references to the Creditors' Plan shall mean

and refer to the Second Amended and Restated Creditors' Plan of Reorganization, which is the

plan of reorganization confirmed by this Court.

**B.    Previous Determinations.**

18.    <u>River Bend Settlement</u>.  On August 26, 1996, the District Court approved a

settlement agreement among the Trustee, the RUS and GSU relating to the disposition of Cajun's

interest in River Bend (the "River Bend Settlement").  The United States Court of Appeals for

the Fifth Circuit affirmed the order of the District Court approving the River Bend Settlement.

*Official Comm. Of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec.*

*Power Coop., Inc.)*, 119 F.2d 349 (5th Cir. 1997).  On December 23, 1997, the River Bend

Settlement was consummated.

19.    <u>RUS/Member Litigation Settlement</u>.  On September 3, 1997, this Court issued its

Reasons for Decision denying the Motion to Strike the Modification to the Trustee's Plan dated

March 4, 1997.  This Court held that the "rebate" offered by the RUS to Members in exchange

for settling litigation with the RUS as disclosed in the March 4, 1997 filing (which "rebate" is

defined in the Creditors' Plan as the "Litigation Settlement Amount") was not discriminatory and

was proper.

20.    <u>Kerr-McGee Settlement</u>.  On October 24, 1997, this Court approved the

settlement agreement between the Trustee and Kerr-McGee Coal Corporation ("Kerr-McGee")

whereby Kerr-McGee agreed to waive rejection damage claims, if any, if its coal supply

agreements with Cajun were rejected on the Effective Date (the "Kerr-McGee Settlement").  No

party appealed this order.

21.     Capital Credits Order. On January 23, 1998, this Court held that the capital credits of the Members constitute equity interests, not claims. No party appealed this order.

22.     RUS Settlement. On February 11, 1999, this Court approved the settlement agreement between the Trustee and the RUS (the "RUS Settlement"). No party appealed this order.

23.     Fuel Chain Settlements. On February 11, 1999, this Court approved (i) the Coal Transportation Settlement Agreement among the Trustee, BN and ACMS (the "BN/ACMS Settlement") and (ii) the Coal Supply Claims Settlement Agreement among the Trustee, Triton and WFA (the "Triton/WFA Settlement"). Appeals of this Court's orders approving these settlements were (or will be) dismissed pursuant to the Confirmation Settlement.

24.     Incorporation of Settlements Into Creditors' Plan. The River Bend Settlement, the Kerr-McGee Settlement, the RUS Settlement, the Confirmation Settlement, the LPSC/RUS Settlement, the BN/ACMS Settlement and the Triton/WFA Settlement were all incorporated by reference into the Creditors' Plan.

25.     Joint Venture Rulings. On February 11, 1999, this Court ruled, in Adv. Pro. Nos. 97-1002 and 97-1068 (*Entergy Gulf States, Inc. v. Western Fuels Association, Inc., et. al.,* and *Entergy Gulf States, Inc. v. American Commercial Terminals, Inc., et al.*), that Entergy was not liable, as a joint venturer with Cajun, to ACMS, BN, Triton and WFA. Appeals of Adv. Pro. No. 97-1068 will be dismissed with prejudice, on the Effective Date of the Creditors' Plan or as soon thereafter as is practicable, as part of the Confirmation Settlement. Appeal of Adv. Pro. No. 97-1002 as well as the following pending litigation among Triton, WFA and Entergy will be dismissed with prejudice, on the Effective Date of the Creditors' Plan or as soon thereafter as is

practicable, upon consummation of the Triton/WFA Settlement under the Creditors' Plan: (1)

*Entergy Gulf States, Inc., et. al. v. Western Fuels Association, Inc. et. al.*, Case No. 97-883-B and

(2) Entergy Gulf States, Inc.'s Motion for Sanctions Pursuant to Federal Rule of Bankruptcy

Procedure 9011, 28 U.S. C. § 1927, and the Inherent Powers of the Court (filed in Case No. 97-

1057-B-M1).

**C.   The Confirmation Rulings.**

26.   <u>Confirmation Decision</u>.  On September 1, 1999, this Court entered its Reasons for

Decision on Confirmation of the Trustee's Fourth Amended and Restated Plan of Reorganization,

now known as the Creditors' Plan (the "Reasons for Decision").  In the Reasons for Decision,

which are incorporated herein by reference, the Court found that the Creditors' Plan satisfied the

confirmation requirements imposed by the Bankruptcy Code and should be confirmed.  This

Court in its Reasons for Decision requested the Proponents of the Creditors' Plan to submit a

proposed Confirmation Order within twenty (20) days after entry of the Reasons for Decision.

On September 21, 1999, the Proponents submitted a proposed form of Confirmation Order.  As

required by the Asset Purchase Agreement, Generating and the Trustee approved the proposed

form of the Confirmation Order.  The RUS has reviewed and approved the proposed form of the

Confirmation Order.

27.   <u>Member Rejection Damages Ruling</u>.  Simultaneously with the issuance of the

Reasons for Decision, this Court ruled on the Trustee's Damage Claim Objection and Motion,

holding that no member rejection damage claims would result from the rejection of the

Members' ARCs under the Creditors' Plan and, therefore, disallowing any and all such claims

(the "Rejection Damages Ruling").  The Rejection Damages Ruling is incorporated herein by reference.

ADDITIONAL FINDINGS AND CONCLUSIONS

**D.   Venue and Jurisdiction.**

28.   <u>Venue and Jurisdiction</u>.  This Court has jurisdiction over confirmation of the Creditors' Plan pursuant to 28 U.S.C. §§ 157 and 1334.  Confirmation of the Creditors' Plan is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of Cajun's chapter 11 case is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**E.   Notice, Solicitation and Voting**

29.   <u>Notice</u>.  Proper, timely, adequate and sufficient notice has been given to all parties in interest of the time fixed for voting on, filing objections with respect to and the Confirmation Hearing on the Creditors' Plan.  The form and scope of the notice given were appropriate under the circumstances and all parties in interest had sufficient opportunity to appear and be heard at the Confirmation Hearing.  Such notice satisfies the requirements of all applicable laws, including the Bankruptcy Code, the Federal Rules of Civil Procedure, the Local Bankruptcy Rules, and the scheduling orders entered by this Court.  Such notice was appropriate and consistent with the due process requirements of the United States Constitution.

30.   <u>Solicitation</u>.  Pursuant to the Disclosure Order, the Trustee distributed or caused to be distributed the Creditors' Plan (then the Trustee's Plan), together with the Trustee's Supplemental Disclosure Statement, Ballots and other solicitation materials (collectively, the "Solicitation Materials") to all holders of impaired claims and interests entitled to vote on the Creditors' Plan (the "Solicitation").  The Solicitation Materials were approved by this Court and

properly served on all necessary parties. In connection with the Solicitation, the Trustee solicited the votes of all creditors and interest holders in good faith and has satisfied his obligations with respect to service of the Solicitation Materials and the requirements of §§ 1125 and 1126.

31.    Service. On September 21, 1999, David S. Rubin, counsel for the Trustee filed a Certificate of Service of the Disclosure Order and the Ballots and Solicitation Materials, confirming that he caused the Solicitation Materials to be served in accordance with the provisions of the Disclosure Order.

32.    Ballot Tabulation. The procedures by which ballots for acceptance or rejection of the Plan were distributed and tabulated were fair and were properly conducted.

33.    Ballot Report. The Ballot Report, which was filed with this Court on June 21, 1999, has not been contested by any party. The Ballot Report reflects that all creditor classes voted to accept the Trustee's Plan. A majority of the class of Member Interests (Class 5) voted to reject the Trustee's (now Creditors') Plan. Therefore the provisions of the Creditors' Plan providing for confirmation pursuant to §1129(b) with respect to such class of Member Interests are invoked.

F.    **Compliance With The Provisions Of Bankruptcy Code Section 1129.**

34.    Compliance with § 1129. The Creditors' Plan complies with all applicable provisions of the Bankruptcy Code, other than §1129(a)(8) as it relates to Class 5. However, notwithstanding the failure of the Creditors' Plan to comply with § 1129(a)(8) as it relates to Class 5, the Creditors' Plan can be confirmed over the rejection of Class 5 pursuant to § 1129(b) as set forth more fully in Finding Paragraph 48 below.

35.    Compliance with Rule 3019. The modifications to the Creditors' Plan made after commencement of the Solicitation period, including the re-naming of the Trustee's Plan as the

Creditors' Plan, the addition of the Proponents, the withdrawal of the Trustee as a proponent, the increase in the purchase price, the First Amendment and the Second Amendment, the amendments required by the Confirmation Settlement and the Confirmation Settlement Order, and all other amendments made to the Creditors' Plan, either were not material, adverse changes to the treatment of claims and interests under the plan or were accepted by any adversely affected creditors or interest holders. No party was treated less favorably under the Creditors' Plan than they were treated under the Trustee's Plan which was included in the Solicitation Materials, unless such party specifically consented to such less favorable treatment. Therefore, no resolicitation or further disclosure is required with respect to the First Amendment, the Second Amendment, the Creditors' Amended and Restated Plan of Reorganization or the Creditors' Plan, and the motions filed by the Proponents pursuant to Bankruptcy Rule 3019 with respect to the First and Second Amendments and the Creditors' Plan should be granted. All votes accepting the Trustee's Plan should be deemed to be acceptances of the Creditors' Plan as so amended.

36.    Sections 1129(a)(1) and (a)(2). Sections 1129(a)(1) and (a)(2) of the Bankruptcy Code are satisfied because the Creditors' Plan complies with the applicable provisions of the Bankruptcy Code and the Proponents have complied with all applicable provisions of the Bankruptcy Code:

a.    Section 1123(a)(1). Section 1123(a)(1) of the Bankruptcy Code is satisfied because the Creditors' Plan designates and classifies all claims and interests other than Administrative Expense Claims and Priority Tax Claims.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING THE SECOND AMENDED AND RESTATED CREDITORS' PLAN OF REORGANIZATION DATED AS OF SEPTEMBER 21, 1999 UNDER CHAPTER 11 OF THE BANKRUPTCY - PAGE 16

b.  **Sections 1122(a) and 1123(a)(4).**  Section 1122(a) and 1123(a)(4) of the Bankruptcy Code are satisfied because the Creditors' Plan designates separate Classes of Claims and Interests, other than Administrative Claims and Priority Tax Claims, each of which contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.  The Creditors' Plan also provides for the same treatment of each claim or interest of a particular class, unless the holder of a claim or interest agrees to less favorable treatment.

c.  **Section 1123(a)(2).**  Section 1123(a)(2) of the Bankruptcy Code is satisfied because the Creditors' Plan specifies the treatment of all unimpaired classes.

d.  **Section 1123(a)(3).**  Section 1123(a)(3) of the Bankruptcy Code is satisfied because the Creditors' Plan specifies the treatment of all impaired classes.

e.  **Section 1123(a)(5).**  Section 1123(a)(5) of the Bankruptcy Code is satisfied because the Creditors' Plan provides adequate means for its execution and implementation.  The provisions of the Creditors' Plan, including but not limited to, the Asset Purchase Agreement, the Kerr-McGee Settlement, the RUS Settlement, the BN/ACMS Settlement, the Triton/WFA Settlement and the River Bend Settlement (all of such settlements being incorporated by reference into the Creditors' Plan) and the choices given to the Members to satisfy their power requirements

provide adequate means for implementation of the Creditors' Plan. For the

reasons stated in the Reasons For Decisions, the modifications necessary

for Generating to implement the SWEPCO PPA option provided to

Members under the Creditors' Plan do not impact the substantive bargain

represented by the SWEPCO PPA and therefore do not violate

§1123(a)(5).

f.    Sections 1123(a)(6) and 1123(a)(7). Sections 1123(a)(6) and 1123(a)(7)

of the Bankruptcy Code are satisfied because the Creditors' Plan provides

that Cajun will be dissolved on or after the Effective Date of the Creditors'

Plan.

g.    Section 1123(b)(1). As permitted by § 1123(b)(1) of the Bankruptcy

Code, the Creditors' Plan impairs or leaves unimpaired, as the case may

be, each class of claims and interests.

h.    Section 1123(b)(2). As permitted by § 1123(b)(2) of the Bankruptcy

Code, the Creditors' Plan provides for the assumption and assignment or

rejection of the executory contracts and unexpired leases of Cajun that

have not previously been assumed, assumed and assigned or rejected

pursuant to § 365 of the Bankruptcy Code.

i.    Section 1123(b)(3). As permitted by § 1123(b)(3) of the Bankruptcy

Code, the Creditors' Plan provides that estate causes of action that have not

otherwise been settled or released will either be dismissed, with the

consent of the RUS, the sole remaining unpaid creditor, or retained and

pursued by the Trustee in accordance with the Creditors' Plan.

j.    Section 1123(b)(4). As permitted by § 1123(b)(4) of the Bankruptcy

Code, the Creditors' Plan incorporates the Fifth Amended and Restated

Asset Purchase Agreement among Generating and the Trustee, and with

respect to certain provisions, NRG, dated as of September 21, 1999, (the

"Asset Purchase Agreement"), pursuant to which substantially all of

Cajun's non-nuclear assets, other than the Excluded Assets, will be sold to

Generating.

k.    Section 1123(b)(6). As permitted by § 1123(b)(6) of the Bankruptcy

Code, the Creditors' Plan includes additional appropriate provisions that

are not inconsistent with applicable provisions of the Bankruptcy Code.

l.    Section 1125. Section 1125 of the Bankruptcy Code is satisfied because

the Solicitation Materials approved by this Court and served upon

creditors and interest holders contained adequate information. As

discussed more fully in the Reasons For Decision, the issues raised

relating to the Trustee's and his law firm's disinterestedness have been

determined by the Court not to be relevant to confirmation of the

Creditors' Plan and no disclosure of such issues was required for the

Trustee Supplemental Disclosure Statement to comply with § 1125.

37.    Section 1129(a)(3). Section 1129(a)(3) of the Bankruptcy Code is satisfied

because the Creditors' Plan has been proposed in good faith and not by any means forbidden by

law. The Asset Purchase Agreement is the result of arms-length negotiations between the

Trustee and Generating. The Creditors' Plan has been proposed with the legitimate and honest

purpose of effectuating a permitted chapter 11 liquidation that treats creditors, equity holders and

rate payers in a manner that is fair and equitable and consistent with the provisions of the

Bankruptcy Code. In addition, for the reasons stated in the Reasons For Decision, neither the

Trustee nor his counsel, LeBoeuf, Lamb, Greene & MacRae L.L.P., intentionally withheld or

delayed disclosure of its representations related to NRG and New Century Energies, Inc. with the

intent to gain any tactical advantage in this Case. Further, for the reasons stated in the Reasons

for Decision, the inclusion in the Creditors' Plan of (i) a release in favor of the Trustee, (ii) the

BN/ACMS Settlement and the Triton/WFA Settlement previously approved by this Court and

(iii) the adoption of the 1999 SWEPCO PPA do not constitute or evidence a lack of good faith;

in any event, the 1999 SWEPCO PPA has been replaced with the 1998 SWEPCO PPA, with

certain changes, as set forth in the Confirmation Settlement.

     38.    Section 1129(a)(4). Section 1129(a)(4) of the Bankruptcy Code is satisfied

because any payments made or promised under the Creditors' Plan for services or for costs and

expenses or in connection with the Case have been approved by, or are subject to approval of,

this Court. No payments have been made prior to Confirmation other than the expense

reimbursement paid to Concordia, SLEMCO and Pointe Coupee pursuant to Order of this Court

dated December 8, 1998. Any payments for fees and expenses for work performed prior to

confirmation of the Creditors' Plan which are subject to approval under § 1129(a)(4) have been

approved by this Court or the District Court or are subject to approval of this Court or the

District Court as reasonable. The fees and expenses paid or to be paid by Generating to its legal,

financial and other professionals will not be paid from assets of the Estate and, accordingly, such professionals are not required to submit their professional fees and expenses to the Court for approval.

39.   <u>Section 1129(a)(5)</u>.  Section 1129(a)(5) of the Bankruptcy Code is satisfied because Cajun will be dissolved in connection with implementation of the Creditors' Plan and there will be no officers and directors of Cajun thereafter.

40.   <u>Section 1129(a)(6)</u>.  Section 1129(a)(6) of the Bankruptcy Code is satisfied because receipt of all required regulatory approvals, including any approvals required from the Federal Energy Regulatory Commission ("FERC") or the LPSC, is a condition precedent to the effectiveness of the Creditors' Plan.

41.   <u>Section 1129(a)(7)</u>.  Section 1129(a)(7) of the Bankruptcy Code is satisfied because each holder of a claim or interest has either accepted its treatment under the Creditors' Plan or such holder, based on the evidence presented, including but not limited to the Liquidation Analysis contained in the Master Disclosure Statement, the testimony of a representative of Wasserstein Perella & Co., and the amount of Generating's final bid under the Creditors' Plan, will receive or retain under the Creditors' Plan property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

42.   <u>Section 1129(a)(8)</u>.  All classes of claims and interests, other than Class 5 (Member Interests), have either voted to accept the Creditors' Plan or are not impaired under the Creditors' Plan as required by § 1129(a)(8).  As set forth more fully in Finding Paragraph 48

below, the Creditors' Plan is confirmable over the rejection of Class 5 under the provisions of

§1129(b).

43.    <u>Section 1129(a)(9).</u> Section 1129(a)(9) of the Bankruptcy Code is satisfied

because the Creditors' Plan properly provides for the treatment of claims of the type specified in

§ 507(a) of the Bankruptcy Code.

44.    <u>Section 1129(a)(10).</u> Section 1129(a)(10) of the Bankruptcy Code is satisfied

because at least one impaired class has accepted the Creditors' Plan, determined without

including any acceptance by an insider.  Specifically, Class 2(a)(1) (the RUS); Class 2(a)(2)

(Hibernia Bank); Class 2(a)(3) (CoBank); and Class 3 (Unsecured Creditors) have accepted the

Creditors' Plan.

45.    <u>Section 1129(a)(11).</u> Section 1129(a)(11) of the Bankruptcy Code is satisfied

because the Creditors' Plan is feasible.  Based on the evidence presented and for the reasons

stated more fully in the Reasons For Decision, the Court concludes as follows with respect to

feasibility:

    (A)    Generating can meet its financial obligations under the Creditors'
Plan and the Asset Purchase Agreement.

    (B)    Except as expressly contemplated in the Creditors' Plan,
confirmation and consummation of the Creditors' Plan are not
likely to be followed by the liquidation, or the need for further
reorganization, of Cajun.

    (C)    The Amended Plan Filing Agreement between NRG and Southern
whereby Southern may sell its interest in Generating to NRG does
not provide a basis to deny confirmation based on feasibility
because NRG's representative has testified that NRG will
consummate the Asset Purchase Agreement, even if Southern

exercises its put or NRG exercises its call thereunder. No evidence
to the contrary was adduced at the Confirmation Hearing.[6]

(D)    The evidence demonstrates that Unsecured Claims (other than
potential claims that are the subject of the Rejection Damages
Ruling) under the Creditors' Plan will be significantly lower than
the $35,240,000 available to pay such claims. Because the
Rejection Damages Ruling holds that the Members do not have
any rejection damages as a result of the rejection of the ARCs, the
condition precedent in the Creditors' Plan requiring Unsecured
Claims to be less than $35,240,000 is satisfied and, therefore, no
feasibility issue is raised by this issue.

(E)    The failure of Members other than SLEMCO, Pointe Coupee and
Concordia to commit to purchase power from Generating does not
render the Creditors' Plan not feasible. The uncontroverted
testimony demonstrates that NRG will consummate the Asset
Purchase Agreement, even if no additional Members commit to
purchase power from Generating.

(F)    Based on the LPSC's ruling that the rate path is "not presumptively
unreasonable," the testimony of the LPSC's expert that the rate
path is "reasonable," and FERC's history of approving market-
based rates, Generating is likely to receive all necessary regulatory
approvals for the transfer of the Acquired Assets to Generating.

(G)    Because SLEMCO, Pointe Coupee, and Concordia have committed
to purchase power from Generating under the Member Long-Term
PPA, and Generating has advised the Court that, for purposes of
confirmation and consummation of the Creditors' Plan,[7] it will
waive any requirement in the Creditors' Plan that CLECO enter
into a Member Long-Term PPA with Generating for the purchase
of Teche's power obligation under its ARC, the condition
precedent in the Creditors' Plan requiring Supporting Members to

---

[6]    The Court has been informed that, as of the present date, NRG has exercised its call under the Amended Plan
Filing Agreement. This fact does not affect the Court's conclusion that the Creditors' Plan is feasible.

[7]    The Court understands that CLECO has recently asserted that it is not obligated to enter into a Member Long-
Term PPA and that the Trustee, Generating and the RUS disagree with this assertion. Generating's agreement
to waive the condition precedent requiring CLECO to execute the Member Long-Term PPA shall not prejudice
any party's right to argue that CLECO is bound to enter into a Member Long-Term PPA and CLECO's right to
argue the contrary.

enter into a Member Long-Term PPA will either be satisfied or waived.

46.    Section 1129(a)(12).  Section 1129(a)(12) of the Bankruptcy Code is satisfied because all fees payable under 28 U.S.C. § 1930 have been paid or will be paid in accordance with Paragraph 11.10 of the Creditors' Plan.

47.    Section 1129(a)(13).  Section 1129(a)(13) of the Bankruptcy Code is satisfied because the Creditors' Plan satisfies the requirements of §§ 1114(e)(1)(B) and (g).

48.    Section 1129(b).  As set forth more fully in the Reasons for Decisions, the Creditors' Plan may be confirmed under § 1129(b) of the Bankruptcy Code notwithstanding the deemed rejection of the Plan by holders of Class 5 Member Interests, the most junior class under the Creditors' Plan, because:

    a.    the Creditors' Plan does not discriminate unfairly with respect to Class 5; and

    b.    the Creditors' Plan is fair and equitable to Class 5, including complying with § 1129(b)(2)(C), because no holder of any Interest junior to Class 5 will receive or retain any property on account of such Interest.

Furthermore, in connection with the Confirmation Settlement, the members of Class 5 that voted to reject the Creditors' Plan have agreed to withdraw their objections to confirmation of the Creditors' Plan.

49.    Section 1129(d).  Section 1129(d) of the Bankruptcy Code is satisfied because the primary purpose of the Creditors' Plan is not the avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act of 1933.  No objection has been filed by any governmental unit or any other Entity asserting that the Creditors' Plan violates § 1129(d).

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING THE SECOND AMENDED
AND RESTATED CREDITORS' PLAN OF REORGANIZATION DATED AS OF SEPTEMBER 21, 1999
UNDER CHAPTER 11 OF THE BANKRUPTCY - PAGE 24

## G.    Executory Contracts.

50.    <u>Pre-Petition Assumed and Assigned Executory Contracts</u>. Pursuant to Article VI

of the Creditors' Plan and Paragraph 3.11 of the Asset Purchase Agreement, and in compliance

with §§ 365 and 1123(b)(2) of the Bankruptcy Code, the Trustee is authorized and directed to

assume and assign to Generating, subject to the occurrence of and effective as of the Effective

Date, the pre-petition executory contracts and unexpired leases set forth on Schedule 4.10 of the

Asset Purchase Agreement and on Exhibit 7 to the Trustee's Original Supplemental Disclosure

Statement dated November 8, 1996.  The pre-petition executory contracts and unexpired leases

assumed and assigned to Generating, as provided herein or in any other Order entered by this

Court as required by the provisions of the Creditors' Plan, shall sometimes collectively be

referred to as the "Assigned Pre-Petition Contracts."  The assumption and assignment, pursuant

to the Creditors' Plan as permitted by §§ 365 and 1123(b)(2), of the Assigned Pre-Petition

Contracts is (i) in the best interest of the estate, its creditors and interest holders, (ii) within the

Trustee's sound business judgment, and (iii) reasonable and necessary to implement the

Creditors' Plan.  All non-debtor parties to Assigned Pre-Petition Contracts shall file any and all

claims for cure amounts in accordance with the provisions of this Order and Paragraph 6.7 of the

Creditors' Plan and such claims shall be allowed or disallowed in accordance with the provisions

of this Order, Paragraph 6.7 of the Creditors' Plan and the Rejection Damages Ruling.

51.    <u>Pre-Petition Rejected Executory Contracts</u>. Pursuant to the Creditors' Plan and

the Asset Purchase Agreement, and in accordance with §§ 365, 1113 and 1123(b)(2) of the

Bankruptcy Code, the Trustee is authorized and directed to reject, subject to the occurrence of

and effective as of the Effective Date, all pre-petition unexpired leases and executory contracts

that are not Assigned Pre-Petition Contracts (the "Rejected Pre-Petition Contracts"). The

rejection of the Rejected Pre-Petition Contracts under the Creditors' Plan is (i) in the best interest

of the estate, its creditors and interest holders, (ii) within the Trustee's sound business judgment

and (iii) reasonable and necessary to implement the Creditors' Plan. Because Cajun will be

dissolved in connection with the Creditors' Plan and will be unable to perform or utilize the

benefits of the Rejected Pre-Petition Contracts, the Rejected Pre-Petition Contracts would be

burdensome and onerous to Cajun's estate. All non-debtor parties to the Rejected Pre-Petition

Contracts shall file any and all claims against the Estate arising from such designation in

accordance with the provisions of this Order and Paragraph 6.7 of the Creditors' Plan and such

claims shall be allowed or disallowed in accordance with the provisions of this Order,

Paragraph 6.7 of the Creditors' Plan and the Rejection Damages Ruling.

      52.   Post-Petition Contracts. Except for those Post-Petition Contracts (as defined in

the Creditors' Plan) that require the consent of the non-debtor party for assignment, which

consent has been withheld, the Trustee is authorized and directed to assign to Generating, subject

to the occurrence of and effective as of the Effective Date, any Post-Petition Contracts entered

into by Cajun prior to November 20, 1996 and designated by Generating pursuant to a list

provided to the Trustee on November 19, 1996. Further, the Trustee, as soon as practicable, shall

provide a list of those Post-Petition Contracts entered into by Cajun on or after November 20,

1996. From this post-November 19, 1996 list provided by the Trustee, which list shall be

updated by the Trustee on a regular basis up to the Effective Date, Generating shall designate, by

written notice to the Trustee no later than thirty (30) days prior to the Effective Date, if

practicable, any additional Post-Petition Contracts that Generating desires to have assigned to it

on the Effective Date. Except for those newly designated Post-Petition Contracts that require the consent of the non-debtor party to such contract for assignment, which consent has been withheld, the Trustee is authorized and directed to assign to Generating, subject to the occurrence of and effective as of the Effective Date, these additional Post-Petition Contracts. The Post-Petition Contracts assigned to Generating pursuant to this Finding Paragraph 52 shall sometimes hereinafter be referred to as the "Assigned Post-Petition Contracts." All Post-Petition Contracts which are not Assigned Post-Petition Contracts (the "Non-Assigned Post-Petition Contracts") shall be Excluded Assets under the Creditors' Plan and, except as provided in the Creditors' Plan, shall not be performed by Cajun or the Estate on and after the Effective Date. All non-debtor parties to the Non-Assigned Post-Petition Contracts shall file any and all claims against the Estate arising from such designation in accordance with the provisions of this Order and Paragraph 6.7(g) of the Creditors' Plan.

53.    Cure Amounts Under Assumed Executory Contracts. The Creditors' Plan makes adequate provision for prompt cure of any default, and compensation for any actual pecuniary loss resulting from such default, under the Assigned Pre-Petition Contracts in accordance with §§ 365(b)(1)(A) and (B) of the Bankruptcy Code. Further, based on the evidence presented, the Court finds that Generating's financial strength provides adequate assurance of the future performance by Generating under such Assigned Pre-Petition Contracts to the extent required by § 365(b)(1)(C) of the Bankruptcy Code.

54.    All-Requirements Contracts. As provided in the Confirmation Settlement, on the Effective Date of the Creditors' Plan, the District Court will dismiss with prejudice all appeals filed with respect to the 1052 Ruling, which Ruling included, without limitation, a holding that the ARCs are assumable and assignable under § 365 of the Bankruptcy Code, but, although

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING THE SECOND AMENDED AND RESTATED CREDITORS' PLAN OF REORGANIZATION DATED AS OF SEPTEMBER 21, 1999 UNDER CHAPTER 11 OF THE BANKRUPTCY - PAGE 27

assumable and assignable, were not assumable under the Trustee's Original Plan.  Upon such dismissal and without need for a further order of this Court, the 1052 Ruling and all underlying orders shall be vacated as moot and Adv. Pro. No. 96-1052, including all counterclaims, shall be dismissed with prejudice, each party to bear its own costs and fees (subject to the Member Expense Reimbursement).

55.    Collective Bargaining Agreements.  The treatment of the Collective Bargaining Agreements under the Creditors' Plan and the Asset Purchase Agreement complies with the provisions of § 1113 of the Bankruptcy Code.

**H.    Transfers Contemplated By The Creditors' Plan.**

56.    Sale Of Acquired Assets to Generating.  The Creditors' Plan incorporates the Asset Purchase Agreement under which substantially all of Cajun's non-nuclear assets will be transferred to, and acquired by, Generating pursuant to §§ 363(b), 363(f), 365, 1123(b)(2) and 1123(b)(4).  The transfers contemplated by the Asset Purchase Agreement are being made in good faith in accordance with § 363(m) of the Bankruptcy Code, maximize the value of the estate and are in the best interests of the creditors and interest holders.  Generating will have paid fair consideration and reasonably equivalent value for the assets purchased pursuant to the Asset Purchase Agreement (the "Acquired Assets," as defined in the Asset Purchase Agreement).  The Purchase Price to be paid by Generating for the Acquired Assets is the result of a spirited bidding process and is not controlled by an impermissible agreement among bidders.  The consummation of the Creditors' Plan and the Asset Purchase Agreement will not result in a fraudulent transfer or any other avoidable or unlawful transfer with respect to Cajun or Generating or any of their respective affiliates or subsidiaries.

57.    <u>Transfer to Generating Free and Clear of Liens</u>. Except as expressly provided in the Creditors' Plan or the Asset Purchase Agreement, all of the Acquired Assets shall vest in Generating free and clear of all liens, claims, encumbrances and interests of any kind.

58.    <u>Distributions to Creditors Free and Clear of Liens</u>. Except as expressly provided in the Creditors' Plan, all of the property distributed under the Creditors' Plan shall vest in the intended recipients thereof free and clear of all liens, claims, encumbrances and interests of any kind.

59.    <u>Distribution Account</u>. Paragraphs 7.7 and 7.8 of the Creditors' Plan specify that, unless otherwise provided, proceeds from the sale of any assets of the estate shall be deposited in the Distribution Account, and that all Cash distributions to be made by the Trustee under the Creditors' Plan shall be disbursed from the Distribution Account. The provisions governing such distributions are fair and reasonable.

60.    <u>No Discharge</u>. The Creditors' Plan provides for the liquidation of all or substantially all of Cajun's property. Cajun will not engage in business after consummation of the Creditors' Plan which specifically provides that Cajun be dissolved on or after the Effective Date. Cajun is an incorporated entity not an individual. Therefore, under § 1141(d)(3) confirmation of the Creditors' Plan will not discharge Cajun.

61.    <u>Dissolution of Cajun</u>. Upon receipt of the distributions to holders of Allowed Claims and Interests under the Creditors' Plan, all claims against Cajun will have been fully satisfied pursuant to the Creditors' Plan and Cajun is qualified to be dissolved under Louisiana law.

**I.    Satisfaction Of Conditions To Confirmation and To Effective Date.**

62.    <u>Conditions Satisfied or Waived</u>.  Each of the conditions precedent to entry of this Confirmation Order, as set forth in Paragraph 9.1 of the Creditors' Plan, have been satisfied or waived.

63.    <u>Conditions Will Be Satisfied or Waived</u>.  Based on the testimony presented at the Confirmation Hearing, all conditions precedent to the occurrence of the Effective Date will either be satisfied or waived.

**J.    Rate Structure.**

64.    <u>LPSC Approval of EWG Status</u>.  Generating has indicated that it will seek the LPSC's determination pursuant to § 32(c) of PUHCA, 15 U.S.C. § 79z-5a(c), that allowing Cajun's generating assets to be "eligible facilities" for operation as an Exempt Wholesale Generator ("EWG") (i) would benefit consumers, (ii) is in the public interest, and (iii) would not violate Louisiana law.

65.    <u>LPSC Reference Point for Rate Evaluation</u>.  As one reference point for judging the reasonableness of the proposed wholesale rates, the LPSC has indicated that it would compare Generating's aggregate 15 year projected levelized rates to those of a hypothetical standalone Cajun.  The LPSC provided testimony at the Confirmation Hearing to this effect.

66.    <u>LPSC Rate Analysis</u>.  As the LPSC has traditionally done in Cajun rate cases, the LPSC consultant's rate path analysis was based on the aggregate or blended rates for all Members.

67.    <u>Levelized Rate for "Stand-Alone Cajun"</u>.  The LPSC's consultant most recently projected the 15 year levelized rates of the standalone Cajun to be 37.95 mills/kwh.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING THE SECOND AMENDED
AND RESTATED CREDITORS' PLAN OF REORGANIZATION DATED AS OF SEPTEMBER 21, 1999
UNDER CHAPTER 11 OF THE BANKRUPTCY - PAGE 30

68.    Rate Path Analysis. The LPSC's consultant also testified that he would
recommend that the LPSC consider any aggregate projected rate path that was within 3-5% of
the projected rates of the standalone Cajun rates to be not presumptively unreasonable.

69.    Rate Projected for Member Long-Term PPA. The LPSC's consultant projected
that Generating's proposed Member Long Term PPA using the "flow through option" rate path
would result in 15 year levelized rates of 39.1 mill/kwh, assuming initial delivered fuel costs of
$1.14/mmbtu and then tracking market prices after 5 years.

70.    Wholesale Rates Under Creditors' Plan. Based on the testimony, the wholesale
rates which Generating proposes to charge are within 5% of the projections by the LPSC's
consultant for the hypothetical "stand-alone" Cajun.

71.    Rates Not Presumptively Unreasonable. The LPSC has determined that
Generating's proposed rate path was not presumptively unreasonable. Moreover, the LPSC's
consultant testified that Generating's proposed rate path was reasonable. In its Order No. U-
17735-K, the LPSC found that any projected aggregate 15 year levelized rate above 39.61 mills
per kwh would be deemed to be presumptively unreasonable. Based on the testimony, the
aggregate wholesale rates that Louisiana Generating proposes to charge pursuant to Creditors'
Plan are at or below this level.

72.    Creditors' Plan Results in Significant Rate Relief. The wholesale rates that
Generating proposes to charge the Members that purchase from Generating will result in a
significant decrease from the rates that the Members currently pay Cajun. The Trustee's expert,
Dr. Yokell, testified that the rates that Generating proposes to charge are approximately twenty
percent (20%) below the average rates that Cajun charged between 1993-1998.

73.  (omitted.)

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING THE SECOND AMENDED
AND RESTATED CREDITORS' PLAN OF REORGANIZATION DATED AS OF SEPTEMBER 21, 1999
UNDER CHAPTER 11 OF THE BANKRUPTCY - PAGE 31

74.   Long- Term PPAs Negotiated at Arm's-Length.  Both long term power purchase options (the Member Long-Term PPA and the SWEPCO PPA) offered by Generating were negotiated with various Members at arms'-length.  Three of the Members (SLEMCO, Pointe Coupee and Concordia) primarily negotiated the Member Long-Term PPA, and the remaining eight Members negotiated the SWEPCO PPA.

75.   Options for Members.  Under the Creditors' Plan, the Members are provided with a number of options with respect to the purchase of electricity.  There is no compulsion for any Member to exercise any particular option.

WHEREFORE, upon the foregoing findings of fact and conclusions of law and upon the entire record of this case, the arguments of counsel and evidence presented at the Confirmation Hearing and all proceedings heretofore had herein, and after due deliberation and good and sufficient cause appearing therefor,

NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED as follows:

1.   Findings of Fact and Conclusions of Law Incorporated.  The findings of fact and conclusions of law set forth above and in the Previous Confirmation Decision, the Reasons for Decision and the Rejection Damages Ruling shall be, and are hereby, incorporated by reference as though fully set forth herein.

2.   Notice Approved.  Due notice of the Confirmation Hearing and an opportunity to object to confirmation of the Competing Plans and the Solicitation were given to all parties in interest.  Such notice complied with the terms of the Disclosure Order, the Ninth Scheduling Order, the applicable sections of the Bankruptcy Code and the Bankruptcy Rules and was appropriate and consistent with the due process requirements of the United States Constitution.

The form and scope of the notice given were appropriate under the circumstances and all parties in interest had an opportunity to appear and be heard at the Confirmation Hearing.

3.    _Plan Confirmed._ The Creditors' Plan shall be, and hereby is, confirmed. The motions filed by the Proponents pursuant to Rule 3019 with respect to the First and Second Amendments and the Creditors' Plan shall be, and hereby are, granted. All votes accepting the Trustee's Plan shall be, and hereby are, deemed to be acceptances of the Creditors' Plan.

4.    _Objections Dismissed and Overruled._ All objections to confirmation of the Creditors' Plan not previously withdrawn pursuant to the Confirmation Settlement are hereby dismissed, with prejudice, pursuant to Paragraph 6 of the Confirmation Settlement and the Confirmation Settlement Order. All objections to confirmation of the Creditors' Plan shall be, and hereby are, overruled pursuant to the Reasons for Decision.

5.    _Asset Purchase Agreement Approved._ The Asset Purchase Agreement, and the Trustee's execution of it, are hereby approved in all respects. The Trustee is authorized and directed to execute and deliver any instruments of sale, transfer, conveyance or assignment, and any consents, assurances, powers of attorney, releases, or other documents, agreements or instruments, as may be necessary, in the reasonable judgment of Generating, to vest in Generating all right, title and interest of Cajun in and to the Acquired Assets free and clear of any and all liens, claims and encumbrances (except as may be specifically allowed in the Asset Purchase Agreement) and otherwise to carry out the purposes and intent of the Asset Purchase Agreement, the transactions contemplated thereunder and the Creditors' Plan. Without limiting the generality of the foregoing, the Trustee is hereby authorized, empowered and directed to issue, execute, deliver, file or record any document, agreement or other instrument contemplated

in the Creditors' Plan, the RUS Settlement and other settlements incorporated therein, whether or not specifically referred to in the Creditors' Plan or any settlements incorporated therein, and to take any action necessary or appropriate to implement, consummate and otherwise effectuate the Creditors' Plan or any settlements incorporated therein in accordance with their terms. The Trustee shall be, and hereby is, authorized to incur and pay any expense reasonably necessary to comply with the provisions of this Order and to consummate the Asset Purchase Agreement.

6.      Assets Transferred Free and Clear to Generating.  In accordance with the provisions of the Asset Purchase Agreement, all right, title and interest of Cajun in and to the Acquired Assets shall be transferred to Generating free and clear of any and all liens, claims and encumbrances (except as may be specifically allowed in the Asset Purchase Agreement).  Upon such transfer, all such liens, claims and encumbrances shall automatically be transferred to the proceeds paid by Generating in accordance with the provisions of the Creditors' Plan.  All creditors or other parties in interest holding liens, claims or encumbrances against the Acquired Assets are hereby directed, no later than the Effective Date, to execute, deliver, file or record any and all lien releases, UCC termination statements or other documents that may be required, and to take any action necessary or appropriate to implement, consummate and otherwise effectuate, the Asset Purchase Agreement in accordance with its terms.  If, after request by Generating, any party fails to execute, deliver, file or record such lien releases, UCC termination statements or other documents, Generating shall be authorized to file same on behalf of and in the name of such defaulting party.

7.      Payment of Allowed Class 3 Unsecured Claims.  In order to facilitate timely payment of the Allowed Unsecured Claims in accordance with Paragraph 5.5(b) of the Creditors' Plan, the Trustee, within ten (10) days after entry of this Confirmation Order, is authorized and

directed to open one or more interest bearing accounts to be collectively designated as the

Distribution Account as set forth in Paragraph 7.8 of the Creditors' Plan. The Trustee is hereby

authorized and directed to deposit the following amounts from the RUS Portion of Segregated

Funds (as defined in the Creditors' Plan) into the Distribution Account, within twenty (20) days

after the entry of this Confirmation Order: (a) that portion of the Unsecured Creditor

Distribution and the RUS Settlement Amount sufficient to make distributions to Allowed Class 3

Unsecured Claims before the Effective Date as set forth in Paragraph 5.5(b) of the Creditors' Plan

and (b) the amount necessary to establish a reserve to provide for the payment of the Western

Fuels Agreed Claims (as defined in the WFA/Triton Settlement) on the Effective Date. The

Trustee is authorized and directed to use such funds deposited in the Distribution Account to

make distributions to Allowed Class 3 Unsecured Claims before the Effective Date as set forth in

Paragraph 5.5(b) of the Creditors' Plan, to make any other distributions to Allowed Class 3

Unsecured Claims in accordance with Paragraph 5.5(b) of the Creditors' Plan and to establish

reserves for disputed claims in accordance with Paragraph 11.12 of the Creditors' Plan. On or

before the Effective Date, the Trustee is further authorized and directed to deposit into the

Distribution Account an additional portion of the Unsecured Creditor Distribution or the RUS

Settlement Amount sufficient to pay the Triton Agreed Claim (as defined in the WFA/Triton

Settlement) on the Effective Date, or as soon thereafter as practicable; if this deposit is made

before the Effective Date, it shall in no event be made from the LPSC Portion of Segregated

Funds. Any unused portion of the Unsecured Creditor Distribution or the RUS Settlement

Amount shall be available for distribution on the Effective Date, or as soon thereafter as

practicable, to the RUS as provided in the Creditors' Plan. For ease of implementation of the

Creditors' Plan, the portion of the Unsecured Creditor Distribution and the RUS Settlement

Amount funded to the Distribution Account for payment of Allowed Class 3 Unsecured Claims

in accordance with Paragraph 5.5(b) of the Creditors' Plan shall be deemed (i) to have been paid

to the RUS Distribution Account (as defined below) and (ii) then repaid from the RUS

Distribution Account to the Distribution Account for distribution by the Trustee to holders of

Allowed Class 3 Unsecured Claims.

      8.   <u>Distribution Account</u>.  In order to facilitate the payment of other distributions

under the Creditors' Plan, on the Effective Date, the Trustee is further authorized and directed to

deposit all of the Debtor's remaining funds into the Distribution Account including, but not

limited to: (i) all proceeds (net out-of-pocket closing expenses) from the sale of Cajun's Assets

pursuant to the Asset Purchase Agreement, (ii) the RUS Portion of Segregated Funds (as defined

in the Creditors' Plan); and (iii) the remaining Segregated Funds.  All valid liens and interests

preserved by the Creditors' Plan shall attach to funds while in the Distribution Account.  On the

Effective Date, the Trustee is authorized and directed to pay the LPSC Portion of Segregated

Funds (as defined in the Creditors' Plan) to the LPSC or such party or parties as the LPSC, in

writing, designates.  Notwithstanding the foregoing, the Trustee, after the Effective Date, shall be

entitled to retain and collect, and shall diligently pursue collection efforts with respect to,

accounts receivable outstanding on the Effective Date and shall be authorized and directed to

distribute to the LPSC and the RUS, as provided above, any accounts receivable proceeds that

are Segregated Funds at such time as the RUS, the LPSC and the Trustee mutually agree or at

such other time as the Court orders.  In accordance with the Creditors' Plan and the terms of the

RUS Settlement and the Confirmation Settlement, the Trustee is authorized and directed to pay

from funds and proceeds deposited in the Distribution Account all distributions and claims as provided in the Creditors' Plan, including, but not limited to all Allowed Administrative Expense Claims, Allowed Ordinary Course Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Claims, the Allowed Class 3 Unsecured Claims, the Unsecured Creditor Distribution, the RUS Settlement Amount, the RUS Allowed Secured Claim, the SWEPCO Break-Up Fee, the Litigation Fund, if any, and the actual and necessary fees, costs and expenses of the Trustee incurred, but not paid prior to the Effective Date (collectively, the "Plan Amounts"); in no event shall any portion of the Plan Amounts be paid from the LPSC Portion of Segregated Funds.  For ease of implementation of the Creditors' Plan, the payments consented to by the RUS in Paragraph 5.1(d) of the Creditors' Plan from funds otherwise payable on account of the RUS Allowed Secured Claims to pay Allowed Administrative Expense Claims, Allowed Ordinary Course Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Claims, the Litigation Fund Amount, the SWEPCO Break-Up Fee, and the actual and necessary fees, costs and expenses of the Trustee accruing or payable after the Effective Date shall be made directly from the Distribution Account and shall be deemed (i) to have been paid to the RUS Distribution Account (as defined below) and (ii) then repaid from the RUS Distribution Account to the Distribution Account for distribution by the Trustee to holders of Allowed Claims.  This Order shall operate as the document setting out the terms under which the Trustee is authorized to operate and administer the Distribution Account in accordance with Paragraph 7.8 of the Creditors' Plan.  The Trustee reserves the right to petition the Court for supplemental orders, as needed, to facilitate the operation and administration of the Distribution Account.  The Trustee is authorized at any time after the entry of this Order to establish the

Distribution Account as a liquidating trust for federal income tax purposes if the Trustee decides. The Trustee is authorized to establish a liquidating trust at any time before the closing of Cajun's chapter 11 case. If the Trustee establishes a liquidating trust, the Trustee is then authorized and directed to file all necessary federal and state income tax returns and notices related to the liquidating trust.

9.   SWEPCO Break-Up Fee. The Trustee is authorized and directed to pay the SWEPCO Break-Up Fee to SWEPCO from the Distribution Account  in accordance with the terms of the Confirmation Settlement. The Trustee is hereby authorized and directed, within twenty (20) days after the entry of this Confirmation Order, to deposit funds from the RUS Portion of Segregated Funds into the Distribution Account in the amount necessary to pay the SWEPCO Break-Up Fee. The Trustee is authorized and directed to use such funds deposited in the Distribution Account to pay the SWEPCO Break-Up Fee to SWEPCO within twenty (20) days after the entry of this Confirmation Order.

10.   RUS Distribution Account. In accordance with the Creditors' Plan, the RUS is directed to establish a segregated escrow account prior to the Effective Date, but in no event later than necessary to allow funds to be transferred to the RUS in accordance with this Order and the Creditors' Plan. Subject to the provisions hereof, this account shall be under the sole dominion and control of the RUS. Except as otherwise set forth in this Order, including as set forth in Ordering Paragraphs 7 and 8 above, all funds subject to the RUS Allowed Secured Claims shall be distributed to the RUS by payment into this account in accordance with the provisions of the Creditors' Plan. The RUS shall provide directions to the Trustee respecting the depositing of funds subject to the RUS Allowed Secured Claims into such account and shall designate an

escrow agent for such account (the "Escrow Agent"). To implement the Creditors' Plan, the

Escrow Agent is hereby authorized and directed (i) to distribute the funds held in the RUS

Distribution Account in accordance with the provisions of the Creditors' Plan, including, but not

limited to Paragraph 5.1(d) of the Creditors' Plan, to the extent not covered by the procedures of

Ordering Paragraphs 7 and 8 above, (ii) to distribute the Litigation Settlement Amount (as

defined in the Creditors' Plan); (iii) to pay the $1 Million Expense Reimbursement (as defined in

the Creditors' Plan), if required, and (iv) to distribute the remainder of the funds in the RUS

Distribution Account to the RUS. To the extent agreed between the Trustee and the RUS, as to

distributions made on account of the RUS Allowed Secured Claims to the RUS Distribution

Account on or after the Effective Date, reserve funds may be held in the RUS Distribution

Account, which funds will not be distributed to the RUS until after the closing of Cajun's chapter

11 case, in order to ensure that there are adequate funds to operate the Estate and close the case.

In the event that such agreement is reached, the Escrow Agent is directed (i) to hold the amount

of such reserve in the RUS Distribution Account until after the closing of Cajun's chapter 11

case, (ii) prior to the closing of Cajun's chapter 11 case, to pay to the Distribution Account from

the reserve funds any amounts agreed to by the RUS for the actual and necessary fees, costs and

expenses incurred or payable by the Trustee after the Effective Date, and, then, (iii) to pay all

remaining funds to the RUS after the closing of Cajun's chapter 11 case.

11.    Reserves. The Trustee is authorized and directed to establish all necessary

reserves in accordance with Paragraphs 11.12 and 11.13 of the Creditors' Plan pending the

allowance of any such asserted or anticipated Claims and a reserve of funds to cover the actual

and necessary fees, costs and expenses of the Trustee incurred post-Effective Date in an amount

agreed upon between the Trustee and the RUS as set forth in Paragraph 5.1(d) of the Creditors'
Plan (the "Reserve Amounts").

    12.    <u>Payments to RUS Distribution Account</u>. Amounts in the Distribution Account
not necessary to pay the Plan Amounts or to fund the Reserve Amounts shall be paid to the RUS
Distribution Account as soon as practicable after the Effective Date.

    13.    <u>Post-Confirmation Operations</u>. The Trustee is hereby authorized and directed to
conduct the business of Cajun and perform the functions described in Paragraph 7.15 of the
Creditors' Plan and, after the occurrence of the Effective Date, to serve as the authorized
representative of the Estate (which shall continue until a final decree is entered pursuant to Rule
3022 of the Bankruptcy Rules) and to take all actions necessary to wind up the affairs of the
Estate, including dissolving Cajun on or after the Effective Date pursuant to Paragraph 7.4 of the
Creditors' Plan and closing the Estate. In the performance of his duties, the Trustee is further
authorized, subject to the continued application of §§ 327 and 328 (until the Effective Date and
thereafter subject to the procedures in Ordering Paragraph 48 below), to pay himself and his
professionals, to hire or retain and pay any and all necessary personnel, including professionals,
to contract for and pay for necessary services and goods, and to insure and pay any and all
necessary fees, costs and expenses until the closing of Cajun's chapter 11 case. All of the
payments referenced in this Ordering Paragraph 13 shall be made by the Trustee from the
Distribution Account. Upon dissolution of Cajun, none of the Trustee, the officers and directors
of Cajun, or the Members will have any obligations or liabilities to any party on behalf of Cajun
or as a result of Cajun's dissolution.

14.    <u>Post-Confirmation Date Cash Collateral Stipulations.</u> In accordance with the Creditors' Plan, the Trustee is authorized and directed to enter into cash collateral stipulations with the RUS providing for the use of cash collateral of the RUS to operate the business of Cajun from and after entry of this Confirmation Order up to and including the Effective Date. In order to facilitate implementation of this provision of the Creditors' Plan, the Cash Collateral Stipulations (as defined in the Creditors' Plan) currently in effect between the Trustee and the RUS, including the budget approved by the RUS for the 1999 year, shall remain in effect up to and including the Effective Date and shall be the Post-Confirmation Date Cash Collateral Stipulations. In accordance with the current Cash Collateral Stipulations, to the extent the Effective Date does not occur until after the close of the 1999 year, the Trustee will prepare and submit budgets for approval by the RUS for all such years after 1999 under the same procedures as have been in place under the current Cash Collateral Stipulations. All fees, costs and expenses incurred after the Effective Date shall be dealt with pursuant to establishing reserves as set forth in Ordering Paragraphs 7, 8, 10 and 11 above.

15.    <u>Dissolution of Cajun.</u> All creditors having been satisfied in accordance with the provisions of the Creditors' Plan confirmed by this Court, this Court determines that all conditions necessary for the dissolution of Cajun under Louisiana law have been met. In implementation of the provisions of the Creditors' Plan, the Members shall be deemed to have approved the dissolution and, therefore, the Trustee is authorized and directed to dissolve Cajun at any time on or after the Effective Date under Louisiana law. Such dissolution may occur, at the Trustee's discretion, at any time on or after the Effective Date, but shall occur prior to the closing of Cajun's chapter 11 case.

16. _Execution of Documents._  All entities holding Claims against or Interests in Cajun that are treated under the Creditors' Plan  are hereby directed to execute, deliver, file or record any document, and to take any action necessary to implement, consummate and otherwise effectuate the Creditors' Plan and the settlements incorporated therein in accordance with its terms, and all such entities shall be bound by the terms and provisions of all documents to be executed, or deemed to be executed, by them in connection with the Creditors' Plan.

17. _Member Elections._  As to the Members electing a Consensual ARC Assignment under the terms of the Creditors' Plan, this Court finds that each of the ARCs with such Members is a legally binding, validly enforceable obligation of the Member that is a party thereto, and that each such ARC can be and is legally assumed and assigned to the qualified entity of the Member's choice, subject to the occurrence of and effective as of the Effective Date, by the Trustee pursuant to the terms of and as set forth in the Creditors' Plan under §§ 365 and 1123 of the Bankruptcy Code.  If a Member elects a Consensual ARC Assignment, the Trustee shall have no obligation to establish that the entity to whom assignment of the ARC is sought is an entity qualified to accept such assignment.  Further, as to any Member electing or deemed to have elected a Consensual ARC Assignment, the Trustee is hereby authorized and directed to assume and assign such ARC and such assumption and assignment is within the Trustee's business judgment and is in the best interests of the estate.  As to the ARCs of Members electing a Consensual ARC Termination, this Court finds that such Members' ARCs are rejected, subject to the occurrence of and effective as of the Effective Date, and such rejection is within the Trustee's business judgment and is in the best interests of the Estate because such rejection results in no liability to Cajun, the Estate or the consenting Member in accordance with the provisions of the

Creditors' Plan.  For the reasons stated in the Rejection Damages Ruling, no rejection damages will result from the rejection of the ARCs, and any and all claims which have been or could be asserted upon rejection of the ARCs under the Creditors' Plan are disallowed.  Whether a Member elects a Consensual ARC Assignment or a Consensual ARC Termination, none of the Estate, Cajun, the officers and directors of Cajun, the Trustee, or the Proponents shall have any liability arising out of either the rejection or assumption of the ARCs under the Creditors' Plan.

18.    <u>Timing for Member Elections</u>.  As provided in the Confirmation Settlement and the Confirmation Settlement Order, the Members other than SLEMCO, Pointe Coupee and Concordia (which Members have previously elected to receive power from Generating under the Member Long-Term PPA) are directed to select an option (and make any applicable fuel elections) for the provision of power after the Effective Date no later than thirty (30) days after a final determination by the LPSC (exclusive of any time periods for seeking reconsideration, rehearing or appeal) in connection with the approvals sought by Generating relative to the Creditors' Plan (the "LPSC Regulatory Ruling").  For any Member that has not timely elected either a Consensual ARC Termination or a Consensual ARC Assignment pursuant to Paragraph 6.1(b) of the Creditors' Plan and this Order no later than thirty (30) days after the LPSC Regulatory Ruling, such Member shall be deemed to have elected (i) a Consensual ARC Termination and (ii) to obtain power from a source other than Generating and none of Generating, the Trustee, the Estate, or Cajun shall have any obligation to provide power to such Member after the Effective Date.  A Member that elects, no later than thirty (30) days after the LPSC Regulatory Ruling, to enter into the Member Long-Term PPA, the Member Short-Term PPA or the SWEPCO PPA with Generating shall be deemed by such election to have entered into such contract with Generating, in the form approved by the LPSC in connection with the

LPSC Regulatory Ruling, and the Member and Generating shall be bound thereto. To document this arrangement, such Member and Generating shall be, and hereby are, directed to execute a written contract within ten (10) days after such election, which contract shall be subject to the occurrence of and effective as of the Effective Date of the Creditors' Plan; provided, however, that failure of the Member or Generating to execute such written contract shall not excuse the non-executing party from performance thereunder.

Generating will not oppose, in any form or manner, any of the power supply options offered to the Settling Members pursuant to paragraph 6.1(b) of the Creditors' Plan. Consistent with applicable law, Generating shall, in good faith, not oppose regulatory approval of the option selected by any Settling Member. To the extent that a Member elects to enter into a contractual arrangement with Generating, either pursuant to the SWEPCO PPA, the Member Long-Term PPA or the Member Short-Term PPA, Generating will, in good faith, support the efforts of the Member to obtain regulatory approval of the proposed transaction; provided however, that Generating shall not guaranty or warrant that the proposed transaction will obtain regulatory approval or be required to take any action that is inconsistent with applicable law. Consistent with applicable law, each Member shall also, in good faith, pursue regulatory approval of its selection of a power supply option offered pursuant to paragraph 6.1(b) of the Creditors' Plan.

19.    Options for Power Purchase. The Members' options for the provision of power after the Effective Date as provided in Paragraph 6.1 of the Creditors' Plan, including, without limitation, the availability of the Member-Long Term PPA, the SWEPCO PPA (March 18, 1998 version) with such modifications as are necessary to increase the energy charge by one-half of one mill (.5 mill) and such conforming, non-substantive modifications as necessary to enable

such contract to be offered by Generating, including without limitation, changes to address

allocation issues and incorporate Generating fuel chain agreements, the Member Short-Term

PPA, the assumption and assignment of a Member's ARC to an entity of its choice and the

market option, are hereby approved as reasonable and are determined to be in the best interests of

the Estate, its creditors and interest holders.  The existence of these alternatives was one of the

bases for this Court's determination in the Rejection Damages Ruling that the Members have no

rejection damages from rejection of their ARCs under the Creditors' Plan.

     20.    <u>Employee Issues and Collective Bargaining Agreements.</u>  The Collective

Bargaining Agreements shall be and hereby are assumed and assigned to Generating, subject to

the occurrence of and effective as of the Effective Date, with the previously agreed

modifications.  In furtherance of Paragraph 3.13 of the Asset Purchase Agreement, and, as

required by that Paragraph, in order to enable the Trustee to minimize severance liability to the

Estate by assisting in the placement of all employees (union or non-union) not hired by

Generating, Generating shall provide the Trustee with a list of employees that it will initially hire

post-Effective Date as soon as practicable, but in no event later than 120 days after the entry of

this Order.  Notwithstanding the foregoing, the Trustee may request the Court to set an earlier

date for Generating to provide the Trustee with the list of employees to be initially hired post-

Effective Date if the Trustee deems the same to be appropriate or necessary.

     21.    <u>Fuel Chain Contracts.</u>  The Fuel Chain Contracts shall be and hereby are rejected,

subject to the occurrence of and effective as of the Effective Date, and any claims arising from

such rejection are treated and shall be allowed or disallowed only in accordance with the

provisions of the BN/ACMS Settlement and the Triton/WFA Settlement as approved by order of

this Court on February 11, 1999. Upon consummation both of the BN/ACMS Settlement and the

Triton/WFA Settlement in accordance with their terms, none of the Estate, the Trustee,

Generating, or Cajun shall have any further liability arising out of the rejection of the Fuel Chain

Contracts. The rejection of these Fuel Chain Contracts under the Creditors' Plan is approved as

reasonable and in the best interests of the Estate, its creditors and interest holders.

22.    Assigned Pre-Petition Contracts and Cure Obligations. The Assigned Pre-Petition

Contracts shall be assumed and assigned on the Effective Date to Generating. In connection with

the assumption and assignment of the Assigned Pre-Petition Contracts, all cure payments which

may be required by § 365(b)(1) of the Bankruptcy Code shall be allowed and shall be paid only

in accordance with the procedures set forth in Paragraph 6.7(b) of the Creditors' Plan. In

accordance with Paragraph 6.7(b)(2) of the Creditors' Plan, not later than thirty (30) days

following the entry of this Order, all parties to Assigned Pre-Petition Contracts shall file and

serve on the Trustee, RUS, NRG, and Generating a "Statement of Cure" (substantially in the

form of the document appended to the Trustee's Original Supplemental Disclosure Statement as

Exhibit 5) to the extent a cure amount is asserted to be owing by the non-debtor party to the

Assigned Pre-Petition Contracts. The Statement of Cure shall set forth in detail all amounts

necessary to (i) cure any default which occurred prior to the Confirmation Date other than a

default of the kind specified in §365(b)(2), and (ii) compensate the claimant for any amounts

required to be paid under §1124(2)(c) (collectively, the "Pre-Confirmation Cure Obligations").

Any party to an Assigned Pre-Petition Contract which does not file a Statement of Cure with the

Court containing the required information on or before the thirtieth (30th) day after entry of this

Order shall have waived any claim against Generating or its constituent members, the Trustee,

the Estate, or Cajun for any Pre-Confirmation Cure Obligations resulting from any default as of

the Confirmation Date and all actions to collect or enforce any such Pre-Confirmation Cure

Obligations shall be, and hereby are, permanently enjoined and restrained. In accordance with

Paragraph 6.7(b)(3) of the Creditors' Plan, not later than thirty (30) days following the Effective

Date, all parties to Assigned Pre-Petition Contracts shall file and serve on the Trustee, RUS,

NRG, and Generating a "Post-Confirmation Statement of Cure" (substantially in the form of the

document appended to the Trustee's Original Supplemental Disclosure Statement as Exhibit 6) to

the extent a cure amount arising after the entry of this Order, but prior to the Effective Date is

asserted to be owing by the non-debtor party to the Assigned Pre-Petition Contract. The Post-

Confirmation Statement of Cure may include only any cure amounts for the period on or after the

Confirmation Date up to and including the Effective Date, and may not allege any cure amounts

arising out of or from the period prior to the Confirmation Date. The Post-Confirmation

Statement of Cure shall set forth in detail all amounts necessary to (i) cure any default which

occurred on or after Confirmation Date other than a default of the kind specified in §365(b)(2),

and (ii) compensate the claimant for any amounts required to be paid under §1124(2)(c) arising

on or after the Confirmation Date (collectively, the "Post-Confirmation Cure Obligations" and,

together with the "Pre-Confirmation Cure Obligations," the "Cure Obligations"). Any party to an

Assigned Pre-Petition Contract which does not file a Post-Confirmation Statement of Cure with

the Court containing the required information on or before the thirtieth (30th) day after the

Effective Date shall have waived any claim against Generating or its constituent members, the

Trustee, the Estate, or Cajun for any Post-Confirmation Cure Obligations resulting from any

default as of the Effective Date and all actions to collect or enforce any such Post-Confirmation

Cure Obligations shall be, and hereby are, permanently enjoined and restrained. The Trustee is authorized and directed to pay all Allowed Cure Obligations in accordance with and pursuant to the procedures set forth in the Creditors' Plan and this Order. In any event, except as otherwise provided in the Asset Purchase Agreement, neither Generating nor its constituent members will be responsible for any Cure Obligations required to be made on account of an Assigned Pre-Petition Contract, and all actions to collect or enforce any such Cure Obligations, whether by setoff or otherwise against Generating or its constituent members shall be, and hereby are, permanently enjoined and restrained. Further, upon the assumption and assignment of the Assigned Pre-Petition Contracts to Generating, and payment by the Estate of any Allowed Cure Obligations, neither the Estate, the Trustee, nor Cajun shall have any further liability under such Assigned Pre-Petition Contracts. Generating, as the assignee of the Assigned Pre-Petition Contracts, will be solely responsible for performance under the Assigned Pre-Petition Contracts, and for any obligations arising under such Assigned Pre-Petition Contracts, from and after the Effective Date. To the extent a showing of adequate assurance of future performance is necessary, assumption of an Assigned Pre-Petition Contract by Generating shall constitute adequate assurance of future performance under such Assigned Pre-Petition Contract, but such assumption shall not subject Generating or its constituent partners to any liability for Cure Obligations.

23.    Claims Under Rejected Pre-Petition Contracts. In accordance with Paragraph 6.7 of the Creditors' Plan, all unexpired lease or executory contracts, including the Rejected Pre-Petition Contracts, that have not been specifically assumed (or assumed and assigned) pursuant to §§365 and 1123 through an order specifically authorizing assumption prior to the

Confirmation Date, through this Order, or through the provisions of the Asset Purchase

Agreement and the Creditors' Plan approved by this Order, are hereby rejected, effective on and

subject to the occurrence of the Effective Date under the Creditors' Plan. Except as otherwise

provided in any order of the Court setting a Bar Date, and except for Claims that have been

previously filed (which include, but are not limited to, Claims required to be filed within 30 days

after entry of any order approving rejection of any executory contract or unexpired lease) or

Claims that have been previously ruled on by the Court (including, but not limited to, the

Member rejection damages finally determined in the Rejection Damages Ruling), any Claims for

pre-petition damages arising from the rejection of an unexpired lease or executory contract,

including but not limited to a Rejected Pre-Petition Contract, must be filed within thirty (30)

days after the entry of this Order and, if appropriate, any claims for post-petition damages arising

from the rejection of an unexpired lease or executory contract, including but not limited to a

Rejected Pre-Petition Contract, must be filed (i) by the Administrative Expense Claim Bar Date

for claims arising after the Petition Date but prior to the Confirmation Date, and (ii) by the

Supplemental Administrative Expense Claim Bar Date for claims arising after the Confirmation

Date, but on or prior to the Effective Date. Any such Claims not filed within the applicable time

period are barred and may not thereafter be asserted against any of the Estate, the Trustee, Cajun,

or Generating, and all actions to collect or enforce any such Claims shall be, and hereby are,

permanently enjoined and restrained. Except as otherwise provided in the Creditors' Plan, all

Claims arising out of any rejected unexpired lease or executory contract, including the Rejected

Pre-Petition Contracts, shall be allowed or disallowed in accordance with the provisions of the

Creditors' Plan, and shall be classified and paid (to the extent allowed) as Unsecured Claims in

Class 3.  Generating shall not assume or be liable for any liabilities, contracts, commitments, or obligations of Cajun under any executory contracts or unexpired leases, including but not limited to the Rejected Pre-Petition Contracts, which have been rejected under the Creditors' Plan, this Order or prior to the Effective Date.

24.   <u>Claims Under Assigned Post-Petition Contracts</u>.  Any non-debtor parties which are parties to Assigned Post-Petition Contracts must file any and all Claims under such Assigned Post-Petition Contracts (i) by the Administrative Expense Claim Bar Date for claims arising prior to the Confirmation Date, and (ii) by the Supplemental Administrative Expense Claim Bar Date for claims arising after the Confirmation Date, but on or prior to the Effective Date.  Any such Claims not filed within these periods shall be deemed barred and may not thereafter be asserted against the Estate, the Trustee, Cajun, Generating, or any other person or entity, and all actions to collect or enforce any such Claims shall be, and hereby are, permanently enjoined and restrained.  Any such Claims which are timely filed within the designated periods by parties to Assigned Post-Petition Contacts that are Acquired Assets will be paid as Administrative Expense Claims as set forth in Paragraph 3.1 of the Creditors' Plan to the extent the same are allowed by the Court by Final Order as Allowed Administrative Expense Claims.  Upon the assignment of the Assigned Post-Petition Contracts to Generating, and payment by the Estate of any Allowed Administrative Expense Claims related to such Assigned Post-Petition Contracts, neither the Estate, the Trustee, nor Cajun shall have any further liability under such Assigned Post-Petition Contracts.  Generating, as the assignee of the Assigned Post-Petition Contracts, will be solely responsible for performance under the Assigned Post-Petition Contracts, and for any obligations arising under such Assigned Post-Petition Contracts, from and after the Effective Date.

25.    <u>Claims Under Non-Assigned Post-Petition Contracts</u>.  Any non-debtor parties which are parties to Non-Assigned Post-Petition Contracts, which are Excluded Assets in accordance with this Order and the Creditors' Plan, must file any and all Claims under such Non-Assigned Post-Petition Contracts (i) by the Administrative Expense Claim Bar Date for claims arising prior to the Confirmation Date, and (ii) by the Supplemental Administrative Expense Claim Bar Date for claims arising after the Confirmation Date, but on or prior to the Effective Date.  Any such Claims not filed within these periods shall be deemed barred and may not thereafter be asserted against the Estate, the Trustee, Cajun, Generating, or any other person or entity, and all actions to collect or enforce any such Claims shall be, and hereby are, permanently enjoined and restrained.  Any such Claims which are timely filed within the designated periods by parties to Non-Assigned Post-Petition Contacts that are Excluded Assets will be paid as Administrative Expense Claims as set forth in Paragraph 3.1 of the Creditors' Plan to the extent the same are allowed by the Court by Final Order as Allowed Administrative Expense Claims.  Generating shall not assume or be liable for any liabilities, contracts, commitments or obligations of Cajun under any Non-Assigned Post-Petition Contracts.

26.    <u>Hydro Contract</u>.  On the Effective Date of the Plan, the Hydro Contract will be assumed and assigned (i) to the individual Members as allocated to the former Members of Cajun entitled to preference, as determined by the Administrator of SPA, on the basis of each Member's load at the time of Southwestern's "Final Power Allocation 1980,) (ii) to a newly-created eligible preference entity for the benefit of the former Members of Cajun entitled to preference as shall be negotiated between SPA, the Trustee, and the Members, or (iii) to the individual Members as allocated to the former Members of Cajun entitled to preference, on any other basis which the

Administrator of SPA determines in accordance with applicable law. In implementation of Paragraph 6.8 of the Creditors' Plan, the Trustee and the SPA are authorized and directed to take whatever actions are necessary and to execute whatever documents are necessary to effect the assumption and assignment of the Hydro Contract in accordance with this Order and with Paragraph 6.8 of the Creditors' Plan. In implementation of Paragraph 6.8 of the Creditors' Plan, the Members are directed to take whatever action is necessary and to execute whatever documents are necessary to effect the assumption and assignment of the Hydro Contract in accordance with the determination of the Administrator of SPA under Paragraph 6.8 of the Creditors' Plan and this Order.

27.  SMEPA, MEAM and SWEPCO Contracts. In accordance with Paragraph 6.6 of the Creditors' Plan, the Trustee is authorized and directed to assume and assign the SMEPA Contract and the SWEPCO Contracts and to assign the MEAM Contract (which was previously assumed by Cajun) to Generating on the Effective Date pursuant to §§365 and 1123. The SWEPCO Contracts shall be assigned to Generating free and clear of any liens or encumbrances, including, but not limited to, the agreement between Cajun, SWEPCO and RUS to make payments to the RUS directly pursuant to the SWEPCO Contracts. From and after the Effective Date of the Creditors' Plan, all payments made by SWEPCO or any other party under the SWEPCO Contracts shall be made directly to Generating, as the assignee of the SWEPCO Contracts pursuant to the Creditors' Plan. On and after the Effective Date of the Creditors' Plan, Generating shall have no obligation to make payments to the RUS pursuant to the SWEPCO Contracts, and any and all payments made pursuant to the SWEPCO Contracts to the RUS on or after the Effective Date shall be assigned and paid over to Generating by the RUS. Nothing in

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING THE SECOND AMENDED
AND RESTATED CREDITORS' PLAN OF REORGANIZATION DATED AS OF SEPTEMBER 21, 1999
UNDER CHAPTER 11 OF THE BANKRUPTCY - PAGE 52

the Creditors' Plan shall release SWEPCO from its obligations under the SWEPCO Contracts,

including, but not limited to, the obligation to make any and all payments pursuant to the

SWEPCO Contracts.

28.    CoBank.  The Secured Claims of CoBank based on the CoBank Letter of Credit

shall be treated in accordance with Paragraph 5.3 of the Creditors' Plan.  In implementation of the

Creditors' Plan and of the Asset Purchase Agreement, Generating is directed to take all necessary

actions and to execute all necessary documents on the Effective Date to assume the liability for

the contingent Claims of CoBank on the Effective Date as set forth in Paragraph 5.3 of the

Creditors' Plan.  On the Effective Date, CoBank shall be deemed to have released any other

mortgage or lien on Cajun's assets securing CoBank's Secured Claims, whether they are

Excluded Assets or Acquired Assets, except for the lien in favor of CoBank on existing and

future CoBank Class E Stock and the CoBank Patronage Dividends, and any proceeds thereof

and related collateral, which lien shall survive confirmation and shall be retained by CoBank

from and after the Effective Date to ensure the satisfaction of CoBank's Allowed Secured

Claims.  Further, on the Effective Date, CoBank is authorized to credit the existing cash

collateral account it holds for all unpaid letter of credit fees from the inception of Cajun's

chapter 11 case through the Effective Date, and for reimbursement of $250,000 for a portion of

the legal fees and expenses it has incurred since the inception of Cajun's chapter 11 case through

the Effective Date.  The CoBank Patronage Dividends and the CoBank Class E Stock shall be

treated, paid or otherwise distributed in accordance with Paragraph 5.3 of the Creditors' Plan.

For ease of implementation of the Plan, any future payments to retire the Class E Stock and the

CoBank Patronage Dividends which are to be made under Paragraph 5.3 for the benefit of the

RUS, which shall retain its lien post-Effective Date on the CoBank Patronage Dividends and the
CoBank Class E Stock, and any proceeds thereof and related collateral (subject to the prior lien
in favor of CoBank on all such collateral), shall be made directly by CoBank to the RUS and not
to the Trustee to be deposited in the Distribution Account. Notwithstanding this direction, if any
such amounts are paid to the Trustee, the Trustee shall deposit such amounts in the Distribution
Account subject to the Allowed Secured Claim of the RUS and shall distribute such funds to the
RUS in accordance with the provisions of the Creditors' Plan governing distributions to the RUS
on account of its Allowed Secured Claim. Further, the record ownership of the CoBank Class E
Stock shall be transferred to the RUS, subject to the prior liens of CoBank, on or after the
Effective Date in accordance with Paragraph 5.3 of the Creditors' Plan. The Trustee, CoBank,
Generating and the RUS are further authorized and directed to take all necessary actions and to
execute and deliver all necessary documents to effectuate the provisions of Paragraph 5.3 of the
Creditors' Plan.

29.    Bar Dates.  On August 31, 1999, in implementation of Paragraph 11.13 of the
Creditors' Plan, the Court entered an Order granting the Trustee's Renewed Motion to Fix
Administrative Expense Bar Dates and for Approval of the Form and Timing of Notice.
Pursuant to such Order, the Court set an Administrative Expense Claim Bar Date and a
Supplemental Administrative Expense Claim Bar Date (collectively, the "Bar Dates"), approved
the forms of notice of such Bar Dates, and approved procedures for service of such notice. Any
claims subject to the Bar Dates which are not timely filed within the Bar Dates shall be forever
barred from participating in the Estate and from asserting any such Administrative Expense
Claims against Cajun, the Trustee, the Estate or its assets, and Cajun's officers and directors, and

from receiving any distributions from the Estate or Cajun on account of said Administrative

Expense Claims. Notwithstanding the establishment of the Bar Dates referred to above, in

accordance with Paragraph 11.13(c) of the Creditors' Plan, these Bar Dates do not apply to

income taxes described in § 503(b)(1)(B) of the Bankruptcy Code, to the fees, costs and expenses

of the Trustee, his professionals employed at the expense of the Estate, or to Ordinary Course

Administrative Expense Claims, as defined in the approved notices of the Bar Dates. Moreover,

these Bar Dates do not apply to claims for Member Expense Reimbursement which are governed

by the provisions of Ordering Paragraph 49 below.

30.   Tax Administrative Expense Claim Bar Date and Allowance and Payment of

Income Taxes. The Trustee is authorized and directed to file a motion requesting the setting of a

bar date for the filing of Administrative Expense Claims arising from income Taxes for the

period beginning on the Petition Date and ending on the Effective Date, which bar date shall be

known as the Tax Administrative Expense Claim Bar Date. Taxes for the year in which the

Effective Date occurs and for the year in which the Petition Date occurred shall be determined in

accordance with Paragraph 3.1(b)(4) of the Creditors' Plan. Upon motion of the Trustee, the Tax

Administrative Expense Claim Bar Date shall be set by the Court ninety (90) days after the

Effective Date, provided that the ninety (90) day period shall not begin to run until the Trustee,

on behalf of Cajun and its Estate, files an appropriate tax return, or, in the case of the tax years

including the Petition Date and the Effective Date, until the Trustee, on behalf of Cajun and its

Estate, provides the equivalent tax return information for such shorter tax periods as is necessary

to determine the tax liability for the shorter tax period at issue. In providing such tax return

information for such shorter tax periods, the Trustee is authorized and directed to provide the tax

return information necessary for the purpose of determining federal income taxes for such shorter tax periods, signed under penalty of perjury, and to include all information that a corporate income tax return would contain. Such information shall be provided to the Internal Revenue Service within a reasonable time after the Effective Date. Any Administrative Expense Claim arising out of income Taxes described in § 503(b)(1)(B) of the Bankruptcy Code subject to the Tax Administrative Expense Claim Bar Date that is not filed on or prior to such bar date shall be barred, and shall not be treated as an Administrative Expense Claim or any other Claim for purposes of Distribution under the Creditors' Plan, whether or not an objection is initiated pursuant to Paragraph 11.11(a) of the Creditors' Plan. In such case, none of Generating, its constituent members, the Trustee, the Estate, Cajun, any officers, directors, or employees acting under the direction of the Trustee, nor the Trustee's or Generating's attorneys, accountants or other professionals shall be liable for any such barred claim. Any Administrative Expense Claim timely filed for federal income Taxes pursuant to this Order and Paragraphs 3.1 and 11.13(c) of the Creditors' Plan on or prior to the Tax Administrative Expense Claim Bar Date shall be allowed as filed unless an objection to such Administrative Expense Claim is filed and served not later than 180 days after the filing of the Administrative Expense Claim, and, after notice and a hearing conducted pursuant to the Bankruptcy Code and Rules, the Court either allows such claim in a lesser amount or disallows such claim. The Trustee is authorized and directed to pay the tax liability of the Estate for the year in which the Effective Date occurred from the sale proceeds of the Acquired Assets sold pursuant to the Asset Purchase Agreement under the Creditors' Plan. In accordance with Paragraph 11.13(c)(ii), the Trustee is further authorized and directed, on or immediately after the Effective Date, to create a reserve fund in the amount of

$20 million from the proceeds of the sale of the Acquired Assets pursuant to the Asset Purchase

Agreement and the Creditors' Plan, until the Allowed Administrative Expense Claim, if any, for

the Estate's federal income Taxes is paid in full or is paid in accordance with the provisions of

the Creditors' Plan (in the event the Allowed Administrative Expense Claims for the Estate's

federal income taxes exceeds the $20 million reserve fund).  Upon the establishment of the

$20 million reserve for the payment of any Allowed Administrative Expense Claim for the

payment of the Estate's federal income Taxes, the Trustee is authorized to distribute the

remainder of the proceeds of the sale of the Acquired Assets pursuant to the Asset Purchase

Agreement and the Creditors' Plan, and any other assets of the Estate, in accordance with the

provisions of the Creditors' Plan, and shall be absolved and released from any personal liability

for the Estate's federal income Taxes.  Notwithstanding the foregoing, the Trustee is authorized

and directed to distribute to the Internal Revenue Service any amounts necessary from the

$20 million reserve fund to satisfy any Allowed Administrative Expense Claim for the Estate's

federal income Taxes.  In the event the Allowed Administrative Expense Claim for the Estate's

federal income Taxes exceeds the $20 million reserve fund, the governmental entities, the RUS

and the Internal Revenue Service, are ordered to resolve any issues regarding disgorgement of

funds between themselves and the RUS is ordered to disgorge part of the funds distributed to it

pursuant to the Creditors' Plan sufficient to pay any remaining amounts due the Internal Revenue

Service in order to satisfy the Allowed Administrative Expense Claim for the Estate's federal

income Taxes in full, in accordance with the terms of Paragraph 11.13(c)(ii) of the Creditors'

Plan.  If the Allowed Administrative Expense Claim for the estate's federal income Taxes is less

than the $20 million reserve fund, then, after payment of the Allowed Administrative Expense

Claim for federal income Taxes in full, the remainder of the reserve fund shall be distributed in accordance with the provisions of the Creditors' Plan. In the event Paragraph 11.13(c)(ii) of the Creditors' Plan is complied with and a $20 million reserve fund is established, then, in no event, shall the Internal Revenue Service be entitled to, nor shall the Trustee be required to, recover, by disgorgement, any funds distributed to Creditors other than the RUS under the Creditors' Plan in order to satisfy the Allowed Administrative Expense Claim for the Estate's federal income Taxes.

31.   Distributions Free and Clear. On the Effective Date of the Creditors' Plan, in accordance with §§ 1141(b) and 1141(c) of the Bankruptcy Code and Paragraph 7.3 of the Creditors' Plan, all property, assets, and effects, wherever situated, of the estate of the Debtor shall be, and they hereby are transferred or distributed as provided in the Creditors' Plan, in each case free and clear of all liens, claims and interests of creditors and equity security holders of the Debtor, except the liens, claims and interests expressly provided for in the Creditors' Plan.

32.   Asset Purchase Agreement Controls. In the event there is any inconsistency between the Creditors' Plan and the Asset Purchase Agreement, the Asset Purchase Agreement will control.

33.   No Successor Liability. Except as otherwise provided in the Asset Purchase Agreement, neither Generating nor its constituent members shall have liability for, or any obligation to make payments for or on account of, any pre-Effective Date obligations of Cajun (whether or not currently known), including but not limited to any Cure Obligations, any Administrative Expense Claims or any liability for any taxes arising out of any transactions consummated by the Trustee on or before the Effective Date. Generating is not intended to be and is not, in fact, a successor to Cajun. None of Generating, its constituent members, affiliates

or its representatives shall have liability for any claims against Cajun as a result of Generating's purchase of the Acquired Assets or the consummation of transactions contemplated by the Asset Purchase Agreement.

34.    <u>Claims Resolution and Payment</u>.  The provisions in Paragraphs 7.7, 7.8 and 11.12 of the Creditors' Plan governing distributions, reserves and the procedures for resolving disputed claims are hereby approved in all respects and found to be fair and reasonable.  The Trustee is authorized and directed to follow such procedures as set forth in the Creditors' Plan.

35.    <u>Plan Binding</u>.  The Creditors' Plan and its provisions shall be binding upon the Debtor, the Trustee, Generating, the Members, the RUS, the LPSC, any entity acquiring property under the Creditors' Plan and any holder of a claim against or interest in the Debtor (whether or not the claim or interest of such holder or obligation of any party in interest is impaired under the Creditors' Plan and whether or not such holder or party in interest has voted, or is deemed to have voted, for or against the Creditors' Plan), as well as their respective heirs, successors, assigns, trustees, subsidiaries, affiliates, officers, directors, agents, employees, representatives, attorneys, beneficiaries, guardians, and similar officer or any Person claiming through or in the right of any such Person.

36.    <u>Stay in Effect</u>.  In accordance with §362, the automatic stay shall remain in full force and effect until the Case is closed.

37.    <u>Distributions Under Plan</u>.  The receipt of the specified treatment under the Creditors' Plan shall be in full satisfaction of the claims or interests of each holder against Cajun treated under the Creditors' Plan, whether or not such claim or interest is determined to be an

Allowed Claim or Interest, or whether or not such holder voted, or is deemed to have voted for or against the Creditors' Plan.

38. <u>Release.</u> Subject to the occurrence of the Effective Date, Generating, the Creditors' Committee, SLEMCO, Pointe Coupee, Concordia and their respective directors, officers and employees, agents, advisors, attorneys and members and professionals, acting in such capacity (collectively, the "Proponent Releasees"), will neither have nor incur any liability to any Entity for any act taken or omitted to be taken in connection with or related to the Case or the formulation, preparation, demonstration, implementation, confirmation or consummation of the Creditors' Plan, the Disclosure Statements or any contract, instrument, or other agreement or document created or entered into, or any other act taken or omitted to be taken in connection with the Creditors' Plan or the Case; provided, however, that the foregoing provisions of this Order will have no effect on the liability of any Proponent Releasees that would otherwise result from a breach of any representation or warranty, or the failure to perform or pay any obligation or liability, under the Creditors' Plan, the Asset Purchase Agreement, or any contract, instrument, or other agreement or document to be delivered in connection with the Creditors' Plan.

39. <u>Trustee Release.</u> The Court has found in its August 31 Reasons for Decision that a release for the Trustee is an appropriate and allowable part of the Creditors' Plan. In accordance with Paragraph 11.5 of the Creditors' Plan, subject to the occurrence of the Effective Date of the Creditors' Plan, the Trustee, Cajun's officers and employees acting under his direction, his agents, advisors, attorneys and other professionals (the "Trustee Released Entities") are released, discharged and forgiven of all claims, demands or causes of action which Cajun, or the Estate owns, holds or is entitled to prosecute on behalf of any other party against the Trustee

Released Entities, and the Trustee Released Entities will neither have nor incur any liability to

any Entity for any act taken or omitted to be taken in connection with or related to the Case or

the formulation, preparation, demonstration, implementation, confirmation or consummation of

the Trustee's (now Creditors') Plan, the Disclosure Statements or any contract, instrument, or

other agreement or document created or entered into, or any other act taken or omitted to be

taken in connection with the Creditors' Plan or the Case; provided, however, that the foregoing

provisions of this Order (i) are limited by the provisions of Paragraph 11.5(e) of the Creditors'

Plan which relates to compensation issues and applications therefor, and (ii) will have no effect

on the liability of any of the Trustee Released Entities that would otherwise result from the

breach of any representation or warranty, or failure to perform or pay any obligation or liability,

under the Creditors' Plan, the Asset Purchase Agreement, or any contract, instrument, or other

agreement or document to be delivered in connection with the Creditors' Plan. Subject to the

limitations set forth above, this release covers all claims or actions, derivative or otherwise,

which may be brought in the name or, on behalf of, or in the right of, Cajun, the Estate or the

Trustee.

40.   _Injunction._ As of the Effective Date, all Entities that have held, currently hold or

may hold a claim, demand, debt, right, cause of action or liability that is released pursuant to the

Creditors' Plan or satisfied under the Creditors' Plan are permanently enjoined from taking any of

the following actions against the Proponent Releasees, the Trustee Released Entities, Entergy or

the Members (the "Global Released Parties"), on account of such released claims, demands,

debts, rights, causes of action or liabilities; (i) commencing or continuing in any manner any

action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any

judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance on any property transferred pursuant to the Creditors' Plan; and (iv) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Creditors' Plan. This Order shall constitute a release, discharge and forgiveness of all claims, demands or causes of actions against the Global Released Parties relating to, or in connection with, Cajun and any other Entity that may hold claims or causes of action against such Global Released Parties arising from or related to Cajun, this Case, the Creditors' Plan or any actions related thereto, except that nothing herein shall release the Global Released Parties from their obligations and duties imposed by and pursuant to the Creditors' Plan, the Asset Purchase Agreement, any document or agreement in connection therewith or from compensation issues governed by Paragraph 3.1(a) of the Creditors' Plan. By accepting distributions pursuant to the Creditors' Plan, each holder of an Allowed Claim or an Allowed Interest receiving distributions pursuant to the Creditors' Plan will be deemed to have specifically consented to the injunctions set forth in this Ordering Paragraph. This Ordering Paragraph does not enjoin actions taken by the LPSC consistent with its regulatory authority and the LPSC/RUS Term Sheet, provided however, nothing herein shall limit, prevent or abridge the right of any party to seek further injunctive relief.

41.    Member Releases. The Trustee is authorized and directed to enter into mutually acceptable releases with the Members as provided in Paragraph 11.5(c) of the Creditors' Plan.

42.    Transfer Taxes. (i) Pursuant to § 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of any security, or the making, delivery, filing or recording of any instrument of transfer, under the Creditors' Plan shall not be restrained, inhibited or prevented in

any way or taxed under any law imposing a recording tax, sales or use tax, franchise tax, stamp

tax, mortgage tax, transfer tax or similar tax; (ii) without limiting the generality of

subparagraph (i) of this Ordering Paragraph, the making, delivery, acceptance, filing or recording

at any time of any deed, bill of sale, mortgage, leasehold mortgage, deed of trust, leasehold deed

of trust, memorandum of lease, notice of Lease, assignment, leasehold assignment, security

agreement, financing statement, tax clearance certificate, agreement, plan or other instrument of

absolute or collateral transfer required by, or deemed necessary or desirable by the Trustee or the

Estate shall not be so restrained, inhibited or prevented in any way or so taxed; (iii) all tax, filing

or recording officers, wherever located and by whomever appointed, are hereby directed to

(A) accept for filing or recording, (B) make or give, or (C) file or record immediately upon

presentation thereof, all such deeds, bills of sale, mortgages, leasehold mortgages, deeds of trust,

leasehold deeds of trust, memoranda of lease, notices of lease, assignments, leasehold

assignments, security agreements, financing statements, tax clearance certificates, agreements,

plans, articles or certificates of merger and other instruments of absolute or collateral transfer

without payment of any recording tax, sales or use tax, franchise tax, stamp tax, mortgage tax,

transfer tax or similar tax imposed by federal, state or local law; (iv) the Clerk of this Court is

hereby authorized to issue a notice in conformance with this Ordering Paragraph, which notice

(A) shall have the effect of an order of the Court, (B) shall constitute sufficient notice of the entry

of this Order to such filing, tax and recording officers, and (C) shall be a recordable instrument

notwithstanding any contrary provision of nonbankruptcy law; and (D) shall be accepted by any

filing, tax or recording officer or authority of any applicable governmental entity for filing or

recording purposes without further or additional orders, certifications or other supporting

documents and this Court hereby authorizes the Trustee to file a memorandum of this Order in

any appropriate filing, tax or recording office as evidence of the matters herein contained and all

filing and recording officers or authorities responsible for the assessment or collection of any

such tax or they may rely on the terms of this Order for all such purposes; and (v) this Court

specifically retains jurisdiction to enforce the foregoing direction, by contempt or otherwise.

Notwithstanding the foregoing, to the extent any such transfer results in any sales or transfer

taxes, such taxes constitute an Administrative expense claim pursuant to § 503 of the Bankruptcy

Code and shall be paid by the Trustee.

43.    Confirmation Settlement Order.  The Confirmation Settlement Order is hereby

incorporated in this Order as though set forth in full herein.

44.    No Effect.  The failure to reference or discuss any particular provision of the

Creditors' Plan herein shall have no effect on the validity, binding effect and enforceability of

such provision, and such provision shall have the same validity, binding effect and enforceability

as every other provision of the Creditors' Plan, including those referenced in this Order.

45.    Reliance on Order.  If any provision hereof is hereafter modified, vacated or

reversed by subsequent order of this Court or any other court, such reversal, modification or

vacation shall not affect the validity of the obligations incurred or undertaken under or in

connection with the Creditors' Plan prior to receipt by the Proponents and the Trustee of written

notice of any such order, nor shall such reversal, modification or vacation hereof affect the

validity or enforceability of such obligations.  Notwithstanding any reversal, modification or

vacation hereof, any such obligation incurred or undertaken pursuant to and in reliance on this

Order prior to the effective date of such reversal, modification or vacation shall be governed in

all respects by the provisions hereof and of the Creditors' Plan, and all documents, instruments and agreements related thereto, or any amendments or modification thereto.

46.    Section 1142(a).  Pursuant to Bankruptcy Code § 1142(a), notwithstanding any otherwise applicable non-bankruptcy law, rule, or regulation relating to financial condition, the Trustee is authorized and directed to carry out the Creditors' Plan and shall comply with any orders of the Court.

47.    Section 1142(b).  The Trustee or the Proponents may file motions for orders in aid of implementation of the Creditors' Plan pursuant to § 1142(b).

48.    Post-Confirmation Notice.  Notice of all motions and applications filed with this Court in connection with or in order to implement the Creditors' Plan after the Confirmation Date, other than fee applications filed pursuant to § 328 of the Bankruptcy Code, shall be served solely on the Trustee, Generating, the Unsecured Creditors' Committee until dissolved, the RUS, the U.S. Trustee, the Members and any party directly affected by such proposed action.

49.    Professional Fees and Member Expense Reimbursement.  Any person or entity seeking an allowance of final compensation or reimbursement of expenses in respect of services rendered and expenses incurred prior to the Effective Date in connection with this Chapter 11 Case pursuant to §§ 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code or pursuant to the Member expense reimbursement provisions of the Creditors' Plan and the Confirmation Settlement shall file an application with this Court, together with proof of service thereof, and serve such application upon the Trustee, the RUS, the Creditors' Committee, Generating, the Committee of Certain Members, the U.S. Trustee and the Members so as to be filed and received no later than forty-five (45) days after the Effective Date or, if no Effective Date occurs, then no later than one year after the entry of this Order (the "Final Fee Application Deadline"), or be

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING THE SECOND AMENDED
AND RESTATED CREDITORS' PLAN OF REORGANIZATION DATED AS OF SEPTEMBER 21, 1999
UNDER CHAPTER 11 OF THE BANKRUPTCY - PAGE 65

forever barred and enjoined from seeking such allowance (such person or entity being referred to

hereinafter as a "Compensation and Expense Claimant"). The fees, costs and expenses paid to

Generating's professionals shall not be subject to Court approval nor shall any further Court

approval be required with respect to the payment of the SWEPCO Break-Up Fee. Member

Expense Reimbursement claims are not claims of estate professionals and shall be governed by

the provisions of section 1129(a)(4) of the Bankruptcy Code, and, subject to substantiation, the

Court will approve all such Member Expense Reimbursement claims for fees, costs and expenses

reasonably incurred by Supporting Members or Settling Members in connection with the Case.

Any objections to any final fee application must be filed with this Court and served no later than

20 days after the Final Fee Application Deadline and, subject to the Court's calendar

requirements, a hearing on the final fee applications and any objections thereto shall be heard as

soon as practicable. The Final Fee Application Deadline has no application to the fees, costs and

expenses of the Trustee, his attorneys or other professionals which are incurred after the

Effective Date. As to such fees, costs and expenses, the Trustee is authorized to pay in full all

such fees, costs and expenses of the Trustee, his attorneys and other professionals incurred after

the Effective Date, up to and including the closing of Cajun's chapter 11 case in full monthly 30

days after the service of invoices to the RUS if, within twenty (20) days after service, the RUS

has not objected in writing, served on the Trustee, to such fees, costs and expenses. If the RUS

serves the Trustee with a written objection, all amounts not objected to may be paid. No

disputed amounts shall be paid unless and until an application for allowance is filed with the

Court, upon notice to the RUS, a hearing is held, and the Court has allowed the same by Final

Order.

50.    <u>Post-Confirmation Modifications</u>.  The Plan Proponents are hereby, subject to further Order of this Court, authorized to amend or modify the Creditors' Plan at any time prior to the Effective Date, but only in accordance with Article X of the Creditors' Plan and § 1127 of the Bankruptcy Code.  In the event such amendments or modifications in any way materially and adversely affect the obligations or rights of the Trustee under the Creditors' Plan or under the Asset Purchase Agreement, then, if the Trustee does not consent, in writing, to such amendments or modifications to the Creditors' Plan, such amendments or modifications shall only be made pursuant to an order of this Court.

51.    <u>Sale in Good Faith</u>.  Generating has purchased the Acquired Assets from Cajun in good faith and is entitled to the benefits and protections afforded by § 363(m) of the Bankruptcy Code.  The purchase price offered by Generating was the maximum amount offered by any bidder, after a spirited bidding process.  Such price was not controlled by an agreement among potential bidders in violation of § 363(n) of the Bankruptcy Code.

52.    <u>Notice of Confirmation</u>.  Within twenty (20) days from the entry of this Order or such further time as this Court may allow, the Trustee shall notify all creditors, equity security holders and other parties in interest of the entry of this Order by mailing a copy thereof to each such creditor, equity security holder and other party in interest.  Such notice in the time and manner set forth is adequate and satisfies the requirements of Bankruptcy Rules 2002(f) and 3020(c) and no further notice is necessary.

53.    <u>Substantial Consummation</u>.  Upon the Closing (as that is defined in the Asset Purchase Agreement) of the Asset Purchase Agreement, the Creditors' Plan shall be deemed to be substantially consummated, as that term is used in § 1127(b) of the Bankruptcy Code.

54.    <u>Unclaimed Distributions</u>.  Any reserves established for the payment of claims remaining in the Distribution Account which have not been claimed within one (1) year after the date of the entry of this Order, shall be distributed to the RUS Distribution Account in accordance with Paragraph 5.5(b) of the Creditors' Plan, and any party which has not sought distribution on account of its Allowed Claim within one year from the entry of this Order shall be forever enjoined from receiving a distribution under the Creditors' Plan and none of the Trustee, the RUS, Cajun, its officers or directors, the Proponents, or the Estate shall have any liability to such party on account of its unclaimed distribution.  This Ordering Paragraph does not apply to reserves held by the Trustee for the administration of the Estate until the case is closed, including, but not limited to, reserves for the payment of Administrative Expense Claims to the extent allowed by the Court.

55.    <u>Retention of Jurisdiction</u>.  Until Cajun's chapter 11 case is closed, the Court (including the District Court or, as to referred matters, this Court) shall retain jurisdiction for the following purposes.  Moreover, the Court may thereafter reopen the Case to exercise jurisdiction for the following purposes.

(a)    To determine any and all objections to the allowance of Claims, including, but not limited to, the classification of any Claim and the reexamination of Claims which have been Allowed for the purposes of voting, the determination of such objections as may be filed to the Claims, and any dispute or controversy relating to any Allowed Claim or any Claim alleged or asserted by any person to be an Allowed Claim;

(b)    To determine all questions and disputes regarding title to the assets to be administered pursuant to the Creditors' Plan, and the determination of all causes of action, controversies, disputes or conflicts subject to an action pending as of the Confirmation Date between the representative of the Estate and any other party, including, but not limited to, the right of the Estate to recover or avoid transfers pursuant to the provisions of the Bankruptcy Code;

(c)    To correct any defect, cure any omission, or reconcile any inconsistency in the Creditors' Plan or order of the Bankruptcy Court, including the Confirmation Order, as may be necessary to carry out the purposes of the Creditors' Plan;

(d)    To consider any modification of the Creditors' Plan after Confirmation pursuant to the Bankruptcy Rules and the Bankruptcy Code;

(e)    To assure the performance by all parties required to take action under the Creditors' Plan and to hear and determine any matter relating to the enforcement, implementation, and interpretation of the terms and conditions of the Creditors' Plan, including, without limitation, the determination of all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Creditors' Plan or in connection with other obligations of Cajun, the Trustee, the Members, the RUS, Generating or its constituent members, or any other party under the Creditors' Plan, and to enter such orders as may be necessary and appropriate in furtherance of consummation and implementation of the Creditors' Plan;

(f)    To enforce and interpret the terms and conditions of the Creditors' Plan and documents related thereto, including the Asset Purchase Agreement and the various settlements incorporated into and made a part of the Creditors' Plan;

(g)    To enter any order, including injunctions, necessary to enforce the provisions of the Creditors' Plan and orders issued in aid of implementation of the Creditors' Plan pursuant to § 1142 of the Bankruptcy Code;

(h)    To enter any order, including any injunction, necessary to enforce the title, rights and powers of Cajun and the Trustee and to impose such limitations, restrictions and terms and conditions of such title, rights and powers as the Court may deem necessary;

(i)    To enter such orders as may be necessary or desirable to facilitate the dissolution of Cajun.

(j)    To enter a final decree under Bankruptcy Rule 3022 terminating this case;

(k)    To hear and determine any and all adversary proceedings, applications or litigated matters pending on the Effective Date or brought after the Effective Date pursuant to the terms of the Creditors' Plan;

(l)    To resolve any and all matters related to the rejection, assumption or assumption and assignment, as the case may be, of executory contracts or unexpired leases to which Cajun is a party or with respect to which Cajun may be liable, to hear and determine, and if need be to liquidate, any and all claims arising therefrom;

(m)    To determine any and all applications for the determination of any priority of any Claim including, without limitation, Claims arising from any event that occurred

prior to the Petition Date or from the Petition Date through the Effective Date and for payment of any alleged Administrative Expense Claim or Priority Tax Claim;

(n)    To consider and act on the compromise and settlement of any Claim against or cause of action by or against the Estate;

(o)    To estimate Claims for purposes of allowance pursuant to § 502(c) of the Bankruptcy Code;

(p)    Except as otherwise provided for under the Creditors' Plan, to determine any and all applications for allowance of compensation and reimbursement of expenses and other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Creditors' Plan;

(q)    To determine any reserve amounts necessary under the Creditors' Plan, as may be requested;

(r)    To determine whether the payment of any Claim hereunder should be subordinated to the payment of other Claims;

(s)    To hear and determine any tax disputes concerning Cajun, including the amount and preservation of Cajun's tax attributes, to determine and declare any tax effects under the Creditors' Plan, and to determine any Taxes which the Estate may incur as a result of the Transactions contemplated herein, pursuant to §§ 346, 505 and 1146 of the Bankruptcy Code;

(t)    To determine such other matters as may be set forth in the Confirmation Order or as may arise in connection with the Creditors' Plan or the Confirmation Order;

(u)    To hear and determine any matter relating to the Case, the Trustee's administration of Cajun and the Cajun Estate, including, without limitation, the determination of all controversies, suits and disputes that may arise or be brought by any party in interest against the Trustee in connection with the Trustee's acts and activities in this Chapter 11 case and the Trustee's administration of Cajun and the Cajun Estate;

(v)    To hear and determine any causes of action arising during the period from the Petition Date through the Effective Date or in any way related to the Creditors' Plan or the transactions contemplated thereby;

(w)    To determine such other matters and for such other purposes as may be provided in this Order;

(x)    To determine all disputes, disagreements, or questions regarding title to the assets of the Debtors or their Estates;

(y)    To construe, enforce and resolve all questions and disputes relating to collective bargaining or employment agreements existing or approved by the Court at or before Confirmation;

(z)    To enforce the Court's orders made in this Case, including but not limited to this Order.

DATED: October 14, 1999

BY THE COURT:

UNITED STATES BANKRUPTCY JUDGE

NA992420.049/56+

EOD 10/15/99
NOTICE MAILED TO:
On 10/15/99 By Regina Callihan

David S. Rubin
Office of the U.S. Trustee

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING THE SECOND AMENDED AND RESTATED CREDITORS' PLAN OF REORGANIZATION DATED AS OF SEPTEMBER 21, 1999 UNDER CHAPTER 11 OF THE BANKRUPTCY - PAGE 71